# EXHIBIT  B

PESSAH LAW GROUP, PC
MAURICE D. PESSAH (SBN: 275955)
maurice@pessahgroup.com
MICHELLE ESHAGHIAN (SBN: 291688)
meshaghian@pessahgroup.com
10100 Santa Monica Bld., Ste. 300
Los Angeles, CA 90067
(310) 772-2261

*Attorneys for Plaintiff*
FITSPOT VENTURES, LLC

FILED
Superior Court of California
County of Los Angeles
AUG 14 2015
Sherri R. Carter, Executive Officer/Clerk
By Annette Fajardo Deputy
Annette Fajardo

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

| | |
|---|---|
| FITSPOT VENTURES, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>SOLOMON BIER, an individual; and DOES 1-25, inclusive,<br><br>Defendants. | Case No: BC590952<br>*Assigned to Hon. Barbara A. Meiers*<br>*Dept. 12*<br><br>**PLAINTIFF FITSPOT VENTURES, LLC'S *EX PARTE APPLICATION* FOR: (1) A TEMPORARY RESTRAINING ORDER AND: (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF.**<br><br>**Hearing Date: August 14, 2015**<br>**Hearing Time: 8:30 a.m.**<br>**Hearing Dept.: 85**<br>**Hearing Judge: Hon. James C. Chaflant**<br><br>Complaint Filed: August 12, 2015<br>Trial Date: None Set |

CIT/CASE: BC590952
LEA/DEF#:
RECEIPT #: CCH505376003
DATE PAID: 08/14/15 08:03 AM
PAYMENT: $60.00
RECEIVED: 310
CHECK: $60.00
CASH: $0.00
CHANGE: $0.00
CARD: $0.00

Plaintiff FITSPOT VENTURES, LLC, by and through its counsel of record, hereby applies to the Court the following *ex parte* application for a Temporary Restraining Order and an Order to Show Cause Re: Preliminary Injunction.

PESSAH LAW GROUP, PC

This application is made pursuant to California Rules of Court Rules 3.1150 and 3.1200, *et seq*. This application will be based upon the Memorandum of Points and Authorities submitted herewith, attached exhibits, the complete files and records in this action, the declaration of Michelle Eshaghian (**"Eshaghian Decl."**), the declaration of Maurice D. Pessah (**"Pessah Decl."**), the declaration of Jonathan Cohn (**"Cohn Decl."**), the declaration of Sammy Courtright (**"Courtright Decl."**) well as any further oral and documentary evidence which may be presented at the hearing.

**Consistent with the mandates of California Rules of Court rule 3.1203 and 3.1204, counsel for Plaintiff provided adequate notice to Defendant of this ex parte application. (Declaration of Michelle Eshaghian ["Eshaghian Decl."] ¶¶ 2-5).**

Dated: August 14, 2015

Respectfully submitted,

PESSAH LAW GROUP, PC

By: ______________________
Maurice D. Pessah, Esq.
Michelle Eshaghian, Esq.
Attorneys for Plaintiff

PESSAH LAW GROUP, PC

2

PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CASE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS IN SUPPORT OF INJUNCTIVE RELIEF ..... 1

A. FITSPOT's Business ..... 1

B. Defendant BIER Had Access to Confidential, Proprietary and Trade Secret Information in His Role as Coding Engineer ..... 2

1. Bier's Contractual Obligations To the Company ..... 2

2. BIER's Access To Plaintiff's Confidential and Proprietary Trade Secrets and Data ..... 4

C. Defendant BIER's has Misappropriated FITSPOT's Proprietary, Confidential and Trade Secret Information, and Usurped Control of FITSPOT's Heroku and Github Accounts ..... 5

III. ARGUMENT ..... 7

A. Standard for Preliminary Injunctive Relief and Temporary Restraining Order ..... 7

B. FITSPOT is Likely to Prevail on the Merits of its Claims ..... 8

1. Misappropriation of Trade Secrets ..... 8

i. *FITSPOT's Confidential Information has Independent Economic Value* ..... 8

ii. *FITSPOT Took Reasonable Steps to Maintain the Secrecy of its Information* ..... 10

2. Breach of Written Contract ..... 10

3. Conversion ..... 11

4. Breach of Fiduciary Duty ..... 11

C. Balance of Hardships ..... 12

D. FITSPOT Will Suffer Irreparable Injury if Defendant BIER Does Not Return Company Property and Data Immediately ..... 12

E. Bond ..... 14

IV. CONCLUSION ..... 14

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Pursuant to California Code of Civil Procedure Section 527, Plaintiff FITSPOT VENTURES, LLC ("FITSPOT" or the "Company") seeks: (1) a temporary restraining order; and (2) an order to show case for a preliminary injunction. The current circumstances are dyer. Plaintiff's business (described below) has become essentially inoperable to its owners as a result of Defendant Solomon Bier's misappropriation of Plaintiff's trade secrets. Defendant now has **exclusive control** of Plaintiff's customer database, technical data and financial information, making the operability of the business nearly impossible.

## II. STATEMENT OF FACTS IN SUPPORT OF INJUNCTIVE RELIEF

### A. FITSPOT's Business

Plaintiff is the creator of "Fitspot," a downloadable mobile application that provides its users with on-demand access to fitness trainers and classes (the "App"). (Declaration of Jonathan Cohn ["Cohn Decl."] ¶ 3)

Upon downloading the App, customers submit their personal contact and health information through the App's interface. (Cohn Decl. ¶ 3) That information is then used to optimize the customer's experience, both in terms of best training options and so that fitness professionals can present themselves at a customer's training location of choice. (Cohn. Decl. ¶ 3) Like the App's

customers, fitness professionals also provide their personal information through the App's interface. (Cohn. Decl. ¶ 3) In turn, the trainers are paid through the App for each session that is booked, and the App takes a small fee for each transaction. (Cohn. Decl. ¶ 3)

An integral component of the App's appeal is the ability to connect customers to fitness professionals instantaneously. (Cohn. Decl. ¶ 4) Once a customer electronically books a session with a trainer, the trainer immediately receives an "alert" notifying him/her of the customer's name, location, desired workout (i.e., yoga or boxing), and appointment time. (Cohn Decl. ¶ 4) The fitness professional has the option to accept or reject the client's request. (Cohn Decl. ¶ 4)

Like all computer-based technologies of its kind, the App's functionality is powered by a set of underlying programming instructions, or code, that allow the App to deliver on its promise and serve its intended purpose—delivering health and fitness. (Cohn Decl. ¶ 5) When the above-described process is anything but efficient, seamless and reliable, customers complain, cancel subscriptions and/or request refunds. (Cohn Decl. ¶ 5) Thus, the Company's ability to modify the underlying code when "glitches" or "bugs" are detected in the App is **crucial**. (Cohn Decl. ¶ 5)

### B. Defendant BIER Had Access to Confidential, Proprietary and Trade Secret Information in His Role as Coding Engineer

#### 1. Bier's Contractual Obligations To the Company

Defendant, SOLOMON BIER ("BIER"), was invited to join the Company as a coding engineer and held the title of "Technical Co-Founder." (Cohn Decl. ¶ X 6) As is typical for early stage development companies, or "startups," BIER's services were rendered in consideration for an equity stake in the Company. BIER's equity stake in the Company was governed by a "Founder's Restricted Unit Agreement" (the "RU Agreement"), pursuant to which BIER was issued "Class B common units of the Company" on a specified vesting schedule (Exh. A to Cohn Decl. ¶ 6 is a true and correct copy of the RU Agreement.) Concurrently with his execution of the RU Agreement, and as a condition to his engagement with the Company, Defendant also entered into and executed a "Confidentiality and Intellectual Property Assignment Agreement," (the "Confidentiality Agreement"). (Exh. B to the Cohn Decl. ¶ 7 is a true and correct copy of the Confidentiality

2

PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CASE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

PESSAH LAW GROUP, PC

Agreement.) Both the **RU Agreement** and the **Confidentiality Agreement** were fully negotiated and vetted by the parties. (Exh. C to Cohn Decl. ¶ 7) The Agreement specifies, *inter alia*, that any intellectual property, passwords, marketing strategies, files, certificates, passwords and other computer information would be the exclusive property of the Company. (Exh. B, Sec. 2 to Cohn Decl. ¶ 7) The Agreement further states that "Confidential Information," was to be "the exclusive property of [FITSPOT]." (See Exh. B to Cohn Decl., Sec. 1, sub. (a)) Confidential Information is defined, among other things, as "files, keys, certificates, passwords and other computer information[.]" (Id.) Importantly, Defendant also agreed to "cooperate with [FITSPOT] and use [his] best efforts to prevent the unauthorized disclosure of Confidential Information." (Exh. B to Cohn Decl., Sec. 1, sub (b)).

Defendant also made the following acknowledgement:

> I acknowledge that all work performed by me is on a "work for hire" basis, and I hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all my right, title and interest in all Developments that (a) relate to the business of the Company or any customer of or supplier to the Company or any of the products or services being researched, developed, manufactured or sold by the Company or which may be used with such products or services; (b) result from tasks assigned to me by the Company; or (c) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company (collectively, "Company-Related Developments"), and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, and other intellectual property rights in all countries and territories worldwide and under any international conventions ("Intellectual Property Rights")

(Exh. B to Cohn Decl., Sec. 2, sub. (a))

Under the Agreement, "Developments" is defined as follows:

> [a]ll inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, mask works, databases, computer programs, formulae, techniques, trade secrets, graphics or images, and audio or visual works and other works of authorship[.]

Critically, Defendant agreed to "cooperate fully" with Plaintiff "both during and after [his] Service Relationship with the Company with respect to the procurement, maintenance and enforcement of

Intellectual Property Rights in Company-Related Developments." (Exh. B to Cohn Decl. ¶ 7, Sec. 3) Defendant expressly agreed:

> I will sign, both during and after the term of this Agreement, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments or priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development.

(Exh. B to Cohn Decl. ¶ 7, Sec. 3)

### 2. BIER's Access To Plaintiff's Confidential and Proprietary Trade Secrets and Data

Discharging his duties under both the RU Agreement and the Confidentiality Agreement (collectively, the "Agreements"), and with the input of the Company's CEO, Jonathan Cohn, BIER began developing and writing the "code" that allows the App to function. (Cohn Decl. ¶ 8) In computer programming, "code" is a term used to refer to statements written in a particular programming language, which automate the performance of specific tasks. *See* https://en.wikipedia.org/wiki/Source_code (last visited August 13, 2015). In order to execute his duties, BIER was provided with a Company issued laptop, monitor, keyboard and mouse, all of which were purchased by the Company. (Cohn Decl. ¶ 8)

In developing the code for the App, BIER relied on subscription-based "cloud platforms" to house the underlying source code, and test the functionality of the App both prior, and subsequent to its release. (Cohn Decl. ¶ 9) Defendant, while acting within the scope of the Agreements, created accounts with at least two such providers: (1) Heroku; and (2) Github. (Cohn Decl. ¶ 9) On May 4, 2015, Defendant, using his "@fitspotapp.com" email address, sent an email to CEO Jonathan Cohn explaining the work he had performed on the App using Plaintiff's Heroku account. (Exh. D, page 2, Cohn Decl. ¶ 9) In the final paragraph of his email he invites CEO Cohn to view and access the "development version" and the "production version" of the App by directing Cohn to two (2) URL hyperlinks inside the Heroku account. (*Id.*)

Github is a free service, Heroku is not. All expenses associated with maintaining the Heroku account were at all times and continue to be paid for by Plaintiff. (Exh. E to Cohn Decl. ¶ 9 are true

PESSAH LAW GROUP, PC

and correct copies of statements from FITSPOT's credit card account. Heroku charges are highlighted in yellow for the Court's convenience) Plaintiff's customer data, proprietary code and App data is all stored in Github and Heroku. (Cohn Decl. ¶ 9) Access to the Github and Heroku accounts that store the code and other sensitive data cannot be overstated: it is absolutely essential and the Company cannot properly function without it. (Cohn Decl. ¶ 9)

In addition to using Heroku and Github to store its data, the Company uses another digital platform known as Slack. (Cohn Decl. ¶ 11) Slack is a collaboration tool that facilitates communication between the code repositories – Github and Heroku – and the Company. (Cohn Decl. ¶ 11) For example, when a user books a fitness session with a trainer, the Slack platform receives data from Heroku and sends an alert to the Company. (Cohn Decl. ¶ 11) This allows the Company to track the amount of bookings it receives and monitor the App's usage. Further, Slack generates automatic notices to the Company if any of the underlying code is modified or altered. (Cohn Decl. ¶ 11) If the Heroku and Github accounts are not integrated with Slack, the Company cannot be made aware of modifications to the code or bookings from users. On August 6, 2015, Defendant BIER accessed Plaintiff's Heroku account and intentionally disabled communication between Plaintiff's Heroku and Slack accounts. As a result, since that date, Plaintiff has been unable to determine when one of its customers books a training session through the App. (Exh. F to Cohn Decl. ¶ 11)

### C. Defendant BIER's has Misappropriated FITSPOT's Proprietary, Confidential and Trade Secret Information, and Usurped Control of FITSPOT's Heroku and Github Accounts

On August 5, 2015, Mr. Jonathan Cohn, FITSPOT's CEO, terminated Defendant's relationship with the company. (Cohn Decl. ¶ 12) Mr. Cohn's action was ratified by the Company's Board of Directors. (Exh. G to Cohn Decl. ¶ 12) Mr. Cohn requested the return of the Company's tangible and intangible property, including but not limited to, the Company's laptop and other hardware, Plaintiff's code, consumer data, access credentials to the repositories that house the App's code, and access credentials to all other accounts used by Defendant to discharge his duties. (Cohn Decl. ¶ 12) Originally, Defendant agreed to comply with this request. (Cohn Decl. ¶ 12) However,

5

PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CASE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

PESSAH LAW GROUP, PC

Defendant ultimately refused to return any of the above, began changing the passwords to the Heroku and Github accounts, disabled integration between the code repositories and Slack, and become unresponsive to all of the Company's communications. (Cohn Decl. ¶ 13) As a result, Plaintiff was entirely deprived of its ability to manage its business: **unable to determine if and when users were booking training sessions, unable to pay trainers, unable to repair glitches in the code, unable to modify <u>any</u> component of the App, unable to access its customer information** and **completely deprived of its ability to access to its own data, trade secrets and intellectual property**. (Cohn Decl. ¶ 13); (*see also*, Courtright Decl. ¶ 3) Moreover, since BIER's nefarious and unlawful actions, many users have: (1) been unable to book sessions (Cohn Decl. ¶ 14) (Exh. A to Courtright Decl. ¶ 4); (2) ceased using the App and requested refunds (Cohn Decl. ¶ 14) (Exh. B to Courtright Decl. ¶ 4); (3) expressed dissatisfaction over the App's failure to properly function. (Cohn Decl. ¶ 14) (Exh. C to Courtright Decl. ¶ 4).

Defendant has retained counsel and, on August 11, 2015, finally returned the Company's laptop, monitor, monitor, keyboard and mouse. (Pessah Decl. 2) However, as Bier's counsel has conceded, Bier "wiped" the hard drive of the laptop, completely erasing any and all data that was once stored therein. (Exh. A to Pessah Decl. ¶ 2) This was done despite clear and unambiguous requests from Plaintiff's counsel to leave the data on the laptop completely unaltered. (Pessah Decl. ¶ 2) Defendant's counsel avers that all of the data once stored on the laptop was placed unto a hard drive in Defendant's possession. (Exh. A to Pessah Decl. ¶ 2)

To add insult to injury, Defendant has also refused to return a company-issued credit card that he was given for expenses. (Cohn. Decl. ¶ 15) Alarmingly, the credit card, which bears both the name Fitspot and BIER, cannot be cancelled without further disrupting the Company's business and customer experience. (Cohn. Decl. ¶ 15) The credit card information is embedded into the source code that allows customers to use promotional codes for the purpose of booking free sessions. (Cohn Decl. ¶ 15) Each time a free session is booked by a newly acquired customer, the Fitspot's credit card is charged. (Cohn Decl. ¶ 15) Cancelling the card currently in BIER's possession, would eliminate the possibility of allowing customers to benefit from free promotional sessions, thereby

PESSAH LAW GROUP, PC

crippling yet another element of FITSPOT's customer experience. (Cohn Decl. ¶ 15) Without access the Heroku account, new credit card information is useless, as it cannot be added to the source code that facilitates the booking of promotional sessions charged to the card in BIER's possession. (Cohn Decl. ¶ 15) It cannot be accessed because BIER has changed the password of FITSPOT's Heroku account.

Although Plaintiff has demanded that Defendant return FITSPOT's property and sensitive data, he refuses. (Cohn Decl. ¶ 15) On August 7, 2015, Sammy Courtright, FITSPOT's Director of Operations, reported BIER's actions to the Los Angeles Police Department (LAPD). (Exh. D to Courtright Decl. ¶ 5)

Plaintiff's counsel has made multiple requests upon Defendant's to have the Company's tangible and intangible property returned. (Pessah Decl. ¶ 3) Defendant's counsel has refused, and, during a phone call, stated that Defendant would require a $50,000 "cash payment" before any property could be returned. (Pessah Decl. ¶ 3) Now, credible information suggests that Defendant is working for another tech company, Honk.com, a downloadable mobile application that provides on-demand service. (Cohn Decl. ¶ 16) While Honk's business is unrelated to fitness, Honk may benefit from the on-demand and real time functions of the source code that Defendant developed for Plaintiff. Such code takes many months to develop. (Cohn Decl. ¶ 16)

## III. ARGUMENT

### A. Standard for Preliminary Injunctive Relief and Temporary Restraining Order

Preliminary injunctive relief should be issued if the plaintiff shows that: (1) it is likely that it will prevail on the merits of its claims; and (2) balance of harm suffered by the plaintiff if the injunction is not issued will be greater than the harm the defendant will suffer if the injunction is issued. *Common Cause of California v. Board of Supervisors* (1989) 49 Cal. 3d 432, 441-442. Moreover, Plaintiff must show a likelihood of great or irreparable injury before the issuance of a temporary restraining order. *Id.* Injunctions in the area of trade secrets are governed by the principles applicable to injunctions in general. *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1449;

7

PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CASE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

PESSAH LAW GROUP, PC

*see also Hilb, Rogal & Hamilton Ins. Services v. Robb* (1995) 33 Cal.App.4th 1812, 1820. As set forth below, Fitspot satisfies these requirements.

**B. FITSPOT is Likely to Prevail on the Merits of its Claims**

**1. Misappropriation of Trade Secrets**

The California Uniform Trade Secrets Act ("CUTSA"), defines "trade secret" as information, including formula, pattern, compilation, program, device, method, technique, or process that: **(1)** derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and **(2)** Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Cal. Civ. Code 3426.1(d).

The damage inflicted through a trade secret's loss and improper use or disclosure to a competitor, can never be undone. For this reason, Cal. Civ. Code 3426.2(a) specifically provides for the injunction of actual or threatened misappropriation. *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1452. **Because of its obvious value and because of Fitspot's reasonable efforts to maintain its secrecy, there should be no question that Plaintiff's codes and customer data are trade secret information.** *See Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 218 (disproved on other grounds by *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310) (stating that "the source code for many if not most commercial software products is a secret, and may remain so despite widespread distribution of the executable program"); *See Agency Solutions.Com, LLC v. TriZetto Group, Inc.* 819 F.Supp.2d 1001, 1017 (E.D. Cal. 2011) (opining that "source code is undoubtedly a trade secret" under California law).

i. *FITSPOT's Confidential Information has Independent Economic Value*

The requirement that confidential information have independent economic value to qualify as a trade secret has been interpreted to mean that the secrecy of this information provides a "substantial business advantage." *See Morlife, Inc. v. Perry* 56 Cal.App.4th 1514,1522 (holding that a confidential list of customers has such value because its disclosure would allow a competitor to solicit more selectively and more effectively). California courts have routinely provided trade secret

protection to customer lists. *See, e.g., Courtesy Temp. Service, Inc. v. Camacho* 22 Cal.App.3d 1278, 1288 (customer list protected as a trade secret where it resulted from a substantial amount of time, expense and effort" and where the "nature and character of the subject customer information is sophisticated information and irrefutable of commercial value and not readily ascertainable to other competitors); *See also Greenly v. Cooper* (1978) 77 Cal. App.3d 382 392 ("[A] list of subscribers of a service, built up ingenuity, time, labor and expense of the owner over a period of many years is property of the employer, a part of the good will of his business and, in some instances, **his entire business.**") (emphasis added).

Moreover, trade secret protection does not require that the information be unknown to the general public. Rather, protection is available for information that has not yet been ascertained by others in the industry (i.e., those to whom the information would be of economic benefit). *ABBA Rubber Co. v. Seaquist* (1991) 235 Cal.3d 1, 21.

In this case, Defendant had and continues to have access to the Company's confidential and proprietary information including, but not limited to: (i) customer information, (ii) source code, and (iii) access credentials to the source code repositories. As is clear under the Agreement, and apparent from the facts and circumstances of BIER's engagement with the Company, the foregoing categories of information unequivocally belong to the Company. By signing the Confidentiality Agreement, Defendant already acknowledged that such information is Plaintiff's property. The urgency of the instant matter is compounded by the fact that Defendant's possession of this information is **to the exclusion** of the Company.

Identifying and gathering customers in the Company's target market (i.e., individuals interested in on-demand, private fitness sessions) has cost substantial time and money, and, as evidenced in the plain language of the Confidentiality Agreement, Fitspot treats this information as highly confidential. (Sec. 1, Sub. (a), of Exh. B to Cohn Decl. ¶ 7) (the Confidentiality Agreement designating and defining "Confidential Information") Personal contact information of customers is important for maintaining long-term customer relationships, which translates into repeat sales for Fitspot. The customer data in Defendant's possession and under Defendant's exclusive control

PESSAH LAW GROUP, PC

contains specific information about a customer's health and fitness goals. (Cohn Decl. ¶ 10) This information would be of great value to a competing fitness application.

**ii.** *FITSPOT Took Reasonable Steps to Maintain the Secrecy of its Information*

The requirement that the owner have taken reasonable steps to protect the information from disclosure may be satisfied, for example, by proof that the employer stored the information securely, restricted access to the information, and used confidentiality provisions in employment contracts or handbooks that obligated employees not to use or disclose the information. *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1454 (requiring employees to sign confidentiality agreements is a reasonable step to ensure secrecy); *ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1018 (employer took reasonable steps to ensure the secrecy of its trade secret information by requesting employees to sign nondisclosure agreements).

Here, Defendant entered into the Confidentiality Agreement as a condition of commencing his engagement with Fitspot. The Confidentiality Agreement delineates the very information that Plaintiff is attempting to have returned through the instant motion. (Sec. 1, Sub. (a), of Exh. B, to Cohn Decl.) ("[C]ustomers, files, keys, certificates, **passwords and other computer information**…") (emphasis added).

**2. Breach of Written Contract**

As described above, Defendant entered into a binding written contract with FITSPOT to maintain the secrecy of FITSPOT's confidential and proprietary information and return all proprietary and confidential (tangible and intangible) information and property to FITSPOT. Moreover, in exchange for an equity stake in the Company (*See* Exh. A to Cohn Decl.), Defendant expressly agreed that all information "concerning the Company's business, technology, business relationships or financial affairs… is and will be the exclusive property of the Company." (*See* Sec. 1, sub. (a), Exh. B to Cohn Decl. ¶ 7) Defendant further agreed that "all work performed by [him] would be on 'work for hire' basis." (*Id.* at Sec. 2, sub. (a))

PESSAH LAW GROUP, PC

Importantly, Defendant further agreed to "fully cooperate with the Company, both during and after [his] Service Relationship with the Company, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in Company-Related Developments." (*Id.* at Sec. 3) Plaintiff has performed all of its obligations under the RU Agreement and the Confidentiality Agreement. The separation, for example, did not divest Defendant of his vested equity stake in the Company. Accordingly, Defendant has unjustifiably and inexcusably breached his obligations under the contracts, and therefore, an injunction is warrant and necessary.

**3. Conversion**

A claim for conversion arises when one person wrongfully exercises dominion over the property of another. *See Fremont Indem. Co. v. Fremont Gen. Corp.* (2007) 148 Cal.App.4th 97, 119. The property can be tangible items or intangible items such as money. *Fischer v. Machado* (1996) 50 Cal.App.4th 1069, 1072.

Although Defendant has now returned ***some*** of Plaintiff's tangible property (i.e., the Company-issued laptop and accessories), Defendant admittedly **wiped the Company's data by restoring the laptop to its original factory settings. Indeed, Defendant even admits that he preserved a copy of the data on a separate hard drive in his exclusive control.** (Exh. A to Pessah Decl. is a true and correct copy of a correspondence from Defendant's counsel) Defendant still has not returned a computer charger, $300 parking pass and a still active FITSPOT credit card.

Furthermore, Defendant has not returned any of Plaintiff's intangible property. For example, the data wiped from the Company's laptop and copied onto an external hard drive, the source code that the Fitspot application relies on to function, and the customer data housed on the Heroku and Github accounts. Based on this evidence, Plaintiff is likely to prevail on its conversion claim.

**4. Breach of Fiduciary Duty**

Defendant's relationship as a shareholder and his title of "Technical Co-Founder," unquestionably establish the fact of his fiduciary obligations to the Company. Defendant's fiduciary obligation and duty of loyalty to the Company is further manifested in the unambiguous terms of the Agreements he entered into with Plaintiff. Defendant's inexcusable refusal to return the

PESSAH LAW GROUP, PC

Company's sensitive intangible data and tangible property, is a blatant breach of his fiduciary obligations to Plaintiff.

**C. Balance of Hardships**

Here, the balance of hardships strongly militate in favor of issuing a temporary restraining order. As a result of Defendant's complete and utter disregard of the Confidentiality Agreement, and his fiduciary duties to Fitspot, Plaintiff's business has been thrust into a complete state of chaos. If an injunction is not issued, Defendant will likely continue to withhold Plaintiff's valuable trade secrets and intellectual property, and be able to disseminate the same with impunity. Issuing the injunction will merely require Defendant to return Plaintiff's tangible and intangible property, including passwords and access credentials to the source code repositories that power Plaintiff's business. Such property never belonged to Defendant to begin with, and returning it to its rightful owner will not harm Defendant in the slightest. Conversely, Defendant's continued **exclusive** access to the property in question will utterly destroy Plaintiff's ability to conduct business, expose Plaintiff to third party liability from its customers, and cause Fitspot a slow and painful demise.

**D. FITSPOT Will Suffer Irreparable Injury if Defendant BIER Does Not Return Company Property and Data Immediately**

In this case, **Defendant has changed the passwords needed to access the code repositories that house the code upon which the Fitspot application relies to function**, denying Plaintiff, its officers and agents access to the same. Thus, Plaintiff is unable to control the application, including but not limited to: (1) repairing "bugs" and "glitches" that are causing the application to fail; and (2) accessing its customer data.

If BIER does not return FITSPOT's intangible and tangible property, including but not limited to, the code and the access credentials to Heroku and Github, over which he has exclusive control, Plaintiff will suffer irreparable harm to its reputation and goodwill.

Since being prevented from accessing to the code repositories (starting August 5, 2015), Plaintiff has been flooded with emails, texts, and phone calls from clients and fitness professionals who are encountering a non-functioning and increasingly useless Fitspot application. Normally,

12

PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CASE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

PESSAH LAW GROUP, PC

Plaintiff could immediately (within 2 hours) repair any glitches or issues stemming from the source code. Now, due to Defendant's actions, Plaintiff has no access to the code repositories and is losing customers and goodwill every minute. Plaintiff cannot control the App's function, or know how many customers are attempting to book sessions. The following is a non-exhaustive list of just some of the issues that FITSPOT's customers and trainers are encountering:

- fitness professionals are unable to confirm requests coming in from clients, causing the both the client and trainer to believe the application is slow, unreliable and a waste of time;
- the fee to be paid to the fitness professional appears incorrectly, causing trainers to reject requests coming in from clients because it is not worth their time;
- fitness professional are locked out of the application and are unable to login altogether;
- client's cancellations are not being received by the fitness professional, causing the fitness professional to erroneously appear at a training session that does not exist;
- clients are being confirmed for training sessions in error, causing the client to be charged in error.

//

Plaintiff's main appeal – quick and reliable on-demand fitness – is now moot. Every minute that passes without Plaintiff having access to the digital platforms that house its source code, is damage to its goodwill and reputation. Plaintiff has been forced to forgo more advanced customer service options and communicate with its customers via text messages. Plaintiff has already received a number of complaints from clients and trainers, and below are just a few examples:

*Trainer not being able to login to his account to view and book sessions.*

*Trainer arriving at a location without being made aware of a customer cancellation.*

*Customer unable to pay for package of training sessions.*

AT&T
9:19 PM
62%
Messages (1)
Group
Details
I've deleted it, downloaded it, still can't
Tollandweems@yahoo.com
tollandweems is password
Correct?
correct
I swear I still can't log in
Log in with Facebook
AT&T M-Cell
9:38 PM
Back (2)
mibeminerals@gmail.com
Details
That's not cool
I'm sorry you drove out there but they cancelled
Why didn't you try to message them and say anything?
I should have been alerted
You should have been but did you try to chat
Did you have any dialogue with them? Any type of confirmation?
I confirm immediately
I didn't receive anything back from them
With a message?
Regarding canceling
I understand but you didn't
AT&T
7:43 PM
Thread
2 of 31
From: Catherine Just
To: Sammy
Re: Fitspot Session
August 11, 2015 at 7:32 PM
Hi Sammy!
Thank you.
I actually tried to sign up for a package and entered all of my payment info and then the app shut off and took me right to the front screen of my phone.
I tried just doing one session and the same thing happened.
Seems the app doesn't work on my phone.
Not sure how to fix it??

(Courtright Decl. ¶ 5)

**E. Bond**

In light of the fact that it is FITSPOT's property at issue, and any injury to Defendant is highly unlikely, any required bond should be minimal, and in no case exceed $5,000.

## IV. CONCLUSION

Plaintiff respectfully requests that the Court grant Plaintiff's *ex parte* application for a temporary restraining order and set a hearing for an order to show cause re: a preliminary injunction.

//

PESSAH LAW GROUP, PC

14

PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CASE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Dated: August 14, 2015

Respectfully submitted,

PESSAH LAW GROUP, PC

By: ______________________
Maurice D. Pessah, Esq.
Michelle Eshaghian, Esq.
Attorneys for Plaintiff

PESSAH LAW GROUP, PC

15

PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CASE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

9/3

**PESSAH LAW GROUP, PC**
MAURICE D. PESSAH (SBN: 275955)
maurice@pessahgroup.com
MICHELLE ESHAGHIAN (SBN: 291688)
meshaghian@pessahgroup.com
10100 Santa Monica Bld., Ste. 300
Los Angeles, CA 90067
(310) 772-2261

*Attorneys for Plaintiff*
FITSPOT VENTURES, LLC

FILED
Superior Court of California
County of Los Angeles

AUG 14 2015

Sherri R. Carter, Executive Officer/Clerk
By [signature] Deputy
Annette Fajardo

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

FITSPOT VENTURES, LLC, a Delaware limited liability company,

Plaintiff,

v.

SOLOMON BIER, an individual; and DOES 1-25, inclusive,

Defendants.

Case No: BC590952
*Assigned to Hon. Barbara A. Meiers*
*Dept. 12*

**DECLARATION OF MAURICE D. PESSAH IN SUPPORT OF PLAINTIFF FITSPOT VENTURES, LLC'S *EX PARTE APPLICATION* FOR: (1) A TEMPORARY RESTRAINING ORDER AND: (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION.**

**Hearing Date: August 14, 2015**
**Hearing Time: 8:30 a.m.**
**Hearing Dept.: 85**
**Hearing Judge: Hon. James C. Chaflant**

Complaint Filed: August 12, 2015
Trial Date: None Set

<u>**DECLARATION OF MAURICE D. PESSAH**</u>

I, Maurice D. Pessah, Esq., declare as follows:

1. I am an attorney duly licensed to practice law in the State of California. I am counsel of record for Plaintiff FITSPOT VENTURES, LLC ("Plaintiff") and the following is within my personal knowledge. If called upon as a witness, I could and would competently testify thereto.

2. On August 11, 2015, after retaining counsel, Defendant Solomon Bier returned the Company's laptop, monitor, monitor, keyboard and mouse. However, as Bier's counsel has conceded, Bier "wiped" the hard drive of the laptop, completely erasing any and all data that was once stored on the laptop. (Attached as **Exhibit A** is a true and correct copy of an email chain between me and Defendant's counsel) This was done despite clear and unambiguous requests from me to leave the data on the laptop completely unaltered. Defendant's counsel avers that all of the data once stored on the laptop was placed unto a hard drive in Defendant's possession. (*See* **Exhibit A**)

3. I have made multiple requests upon Defendant's counsel to have the Company's tangible and intangible property returned. Defendant's counsel has refused, and, during a phone call, requested that Defendant would require a $50,000 "cash payment" before any property could be returned.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this 14 day of August, 2015 at Los Angeles, California.

Maurice D. Pessah, Declaration

2

DECLARATION OF MAURICE D. PESSAH ISO PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

PESSAH LAW GROUP, PC

150827 1 8 0 8

08/18/2015

EXHIBIT A

## Maurice Pessah

**From:** Maurice Pessah <maurice@pessahgroup.com>
**Sent:** Tuesday, August 11, 2015 5:09 PM
**To:** 'Stephen Dunkle'
**Cc:** 'Roby Yadegar'; 'Michelle Eshaghian'
**Subject:** FW: Fitspot Ventures LLC v. Solomon Bier

Stephen-

In addition to my email below, I would add the laptop has been delivered without a charger and that your client's parking pass has not been returned.

Maurice

---

**From:** Maurice Pessah [mailto:maurice@pessahgroup.com]
**Sent:** Tuesday, August 11, 2015 5:03 PM
**To:** 'Stephen Dunkle' <sdunkle@sangerswysen.com>
**Cc:** 'Michelle Eshaghian' <meshaghian@pessahgroup.com>; 'Roby Yadegar' <roby@yadegarlawpc.com>
**Subject:** RE: Fitspot Ventures LLC v. Solomon Bier

Stephen-

The laptop was delivered literally five minutes ago, and will be preserved in its original state.

The admission you just made about the computer's contents being altered is alarming and will only buttress our claims.

A lawsuit has already gone out for filing, and was picked up by our attorney service before the laptop was delivered. This morning, you originally asked for our FedEx credentials as a precondition to ship the laptop. When I requested an originating address and offered to pay for shipping, you became nonresponsive.

Again, there will be no discussion until all of the company's property is returned. This includes the Heroku and Github credentials, the front-end and back-end code, and any and all other property that falls within the scope of the Confidentiality and Intellectual Property Assignment Agreement.

Maurice D. Pessah
**Attorney at Law**
10100 Santa Monica Blvd., Third Floor
Los Angeles, CA 90067

Direct. (310) 772-2261
Mobile. (310) 500-8221
maurice@pessahgroup.com

PESSAH LAW GROUP

---

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, please be advised that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

ExA

Confidentiality: This email (including attachments thereto) may contain confidential material, or privileged and/or attorney work product that is for the sole and exclusive use of its intended recipient(s). Review, reliance or distribution by others, or forwarding,for any reason without express permission is strictly prohibited. If you are not the intended recipient(s), please contact the sender immediately and delete all copies. Thank you.

---

**From:** Stephen Dunkle [mailto:sdunkle@sangerswysen.com]
**Sent:** Tuesday, August 11, 2015 4:53 PM
**To:** Maurice Pessah <maurice@pessahgroup.com>
**Cc:** Michelle Eshaghian <meshaghian@pessahgroup.com>; Roby Yadegar <roby@yadegarlawpc.com>
**Subject:** Re: Fitspot Ventures LLC v. Solomon Bier

Mr. Pessah,

Again, your threats are not well taken.

My client received confirmation that the laptop and computer accessories were delivered to your office by courier this afternoon. The laptop has been restored to its original factory settings. A copy of the data on the laptop is preserved on a separate hard drive. My client's code and a backup version remain preserved on my client's Heroku and Github accounts.

If your client is not interested in discussing settlement, then we will proceed accordingly.

Sincerely,

Stephen K. Dunkle
Appellate Law Specialist*
SANGER SWYSEN & DUNKLE

sdunkle@sangerswysen.com

805-962-4887

**PESSAH LAW GROUP, PC**
MAURICE D. PESSAH (SBN: 275955)
maurice@pessahgroup.com
MICHELLE ESHAGHIAN (SBN: 291688)
meshaghian@pessahgroup.com
10100 Santa Monica Bld., Ste. 300
Los Angeles, CA 90067
(310) 772-2261

*Attorneys for Plaintiff*
FITSPOT VENTURES, LLC

FILED
Superior Court of California
County of Los Angeles
AUG 14 2015
Sherri R. Carter, Executive Officer/Clerk
By Annette Fajardo Deputy
Annette Fajardo

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

FITSPOT VENTURES, LLC, a Delaware limited liability company,

Plaintiff,

v.

SOLOMON BIER, an individual; and DOES 1-25, inclusive,

Defendants.

Case No: BC590952
*Assigned to Hon. Barbara A. Meiers*
*Dept. 12*

**DECLARATION OF MICHELLE ESHAGHIAN RE: NOTICE OF *EX PARTE* IN SUPPORT OF PLAINTIFF FITSPOT VENTURES, LLC'S *EX PARTE APPLICATION* FOR: (1) A TEMPORARY RESTRAINING ORDER AND: (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION.**

**Hearing Date: August 14, 2015**
**Hearing Time: 8:30 a.m.**
**Hearing Dept.: 85**
**Hearing Judge: Hon. James C. Chaflant**

Complaint Filed: August 12, 2015
Trial Date: None Set

PESSAH LAW GROUP, PC

**DECLARATION OF MICHELLE ESHAGHIAN RE: NOTICE OF *EX PARTE***

I, Michelle Eshaghian, Esq., declare as follows:

1. I am an attorney duly licensed to practice law in the State of California. I am counsel of record for Plaintiff FITSPOT VENTURES, LLC ("Plaintiff") and the following is within my personal knowledge. If called upon as a witness, I could and would competently testify thereto.

2. On August 13, 2015, at 9:58 a.m., I emailed Defendant's counsel, Stephen Dunkle of Sanger, Swysen & Dunkle, giving notice of this *ex parte* application to be filed and heard on August 14, 2015 at 8:30 a.m. in Department 85, for: (1) a temporary restraining order; and (2) an order to show cause re: preliminary injunction, against Defendant Solomon Bier. Moreover, I asked Mr. Dunkle to advise if he will be opposing **and** if he will be appearing. (A true and correct copy of said email is attached hereto as **Exhibit A** and incorporated by reference herein).

3. On August 13, 2015 at 1:09 p.m., Daniel T. Ho of the Law Offices of Daniel T. Ho, emailed me advising of his intent to appear at the *ex parte* hearing ~~on behalf of Mr. Bier.~~ Mr. Ho, while not stating exactly if he represents Mr. Bier, was not sure if he would be opposing the *ex parte* application and requested more detail about the relief Plaintiff was seeking. (A true and correct copy of said email is attached hereto as **Exhibit A** and incorporated by reference herein).

4. On August 13, 2015 at 3:44 p.m., I email Mr. Ho advising him that Plaintiff would be seeking mandatory and prohibitory injunctive relief, compelling Mr. Bier to return and refrain from using Plaintiff's intangible and tangible property. I agreed to provide Mr. Ho with a copy of Plaintiff's *ex parte* papers as soon as they were finalized. (A true and correct copy of said email is attached hereto as **Exhibit A** and incorporated by reference herein).

5. On August 13, 2015 at 4:33 p.m., Mr. Ho emailed me advising that he will be opposing Plaintiff's *ex parte* application. (A true and correct copy of said email is attached hereto as **Exhibit A** and incorporated by reference herein).

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

//

2

DECLARATION OF MICHELLE ESHAGHIAN RE: NOTICE OF *EX PARTE* ISO PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

Executed this 13 day of August, 2015 at Los Angeles, California.

Michelle Eshaghian, Declarant

PESSAH LAW GROUP, PC

08/17/2015

3

DECLARATION OF MICHELLE ESHAGHIAN RE: NOTICE OF *EX PARTE* ISO PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

08/18/2015

EXHIBIT A

**Michelle Eshaghian**

**From:** Dan Ho <dan@danholaw.com>
**Sent:** Thursday, August 13, 2015 4:33 PM
**To:** Michelle Eshaghian
**Subject:** Re: Fitspot Ventures, LLC v. Solomon Bier - EX PARTE NOTICE

Ms. Eshaghian,

I will appear and oppose the ex parte application. Thank you.

Dan

**Large Firm Experience, Small Firm Attention.**
11500 W. Olympic Blvd., Ste. 400
Los Angeles, CA 90064
Tel: (310) 312-4520
Fax: (310) 773-9874
Web: www.danholaw.com

-------------------------------------------------------------

The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

Any tax information or written tax advice contained herein (including any attachments) is not intended to be and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.
(The foregoing legend has been affixed pursuant to U.S. Treasury Regulations governing tax practice.)

---

**From:** Michelle Eshaghian <meshaghian@pessahgroup.com>
**Date:** Thursday, August 13, 2015 3:43 PM
**To:** Daniel Ho <dan@danholaw.com>
**Cc:** "maurice@pessahgroup.com" <maurice@pessahgroup.com>
**Subject:** RE: Fitspot Ventures, LLC v. Solomon Bier - EX PARTE NOTICE

Mr. Ho,

Thank you for your email. Plaintiff will be seeking mandatory and prohibitory injunctive relief, compelling Mr. Bier to return and refrain from using Plaintiff's intangible and tangible property. Mr. Bier was served with a copy of the summons and complaint yesterday afternoon, which of course, provides the details of Plaintiff's allegations.

We will provide you with copy of our *ex parte* papers as soon as they are finalized.

Very truly yours,

Michelle Eshaghian
**Attorney at Law**
10100 Santa Monica Blvd., Third Floor
Los Angeles, CA 90067

Tel. (310) 772-2261

ExA

meshaghian@pessahgroup.com

PESSAH LAW GROUP

---

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, please be advised that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Confidentiality: This email (including attachments thereto) may contain confidential material, or privileged and/or attorney work product that is for the sole and exclusive use of its intended recipient(s). Review, reliance or distribution by others, or forwarding,for any reason without express permission is strictly prohibited. If you are not the intended recipient(s), please contact the sender immediately and delete all copies. Thank you.

---

**From:** Dan Ho [mailto:dan@danholaw.com]
**Sent:** Thursday, August 13, 2015 1:09 PM
**To:** meshaghian@pessahgroup.com
**Cc:** maurice@pessahgroup.com
**Subject:** Re: Fitspot Ventures, LLC v. Solomon Bier - EX PARTE NOTICE

Ms. Eshaghian,

I expect to appear at the hearing referenced below on behalf of Mr. Bier.

I don't know whether I will oppose your *ex parte* application because your request for relief isn't specific. Please articulate the relief you will be requesting via temporary restraining order and, subsequently, by preliminary injunction. Please also serve your papers as soon as reasonably possible.

Thank you for your expected courtesy and cooperation.

Dan

DTH
THE LAW OFFICE OF
DANIEL T. HO

**Large Firm Experience, Small Firm Attention.**
11500 W. Olympic Blvd., Ste. 400
Los Angeles, CA 90064
Tel: (310) 312-4520
Fax: (310) 773-9874
Web: www.danholaw.com

---

The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

Any tax information or written tax advice contained herein (including any attachments) is not intended to be and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.
(The foregoing legend has been affixed pursuant to U.S. Treasury Regulations governing tax practice.)

---

**From:** Michelle Eshaghian [mailto:meshaghian@pessahgroup.com]
**Sent:** Thursday, August 13, 2015 9:58 AM

**To:** Stephen Dunkle <sdunkle@sangerswysen.com>
**Cc:** Maurice Pessah <maurice@pessahgroup.com>
**Subject:** RE: Fitspot Ventures, LLC v. Solomon Bier - EX PARTE NOTICE

Mr. Dunkle,

Please take notice that on August 14, 2015 at 8: 30 a.m., in Department 85 of the Los Angeles Superior Court, located at 111 North Hill Street, Los Angeles, California 90012, **Plaintiff FITSPOT VENTURES, LLC will be filing an *ex parte* application for: (1) a temporary restraining order; and (2) an order to show cause re: preliminary injunction, against Defendant SOLOMON BIER.**

Please advise if you will be opposing **and** if you will be appearing.

Very truly yours,

Michelle Eshaghian

**Attorney at Law**

10100 Santa Monica Blvd., Third Floor

Los Angeles, CA 90067

Tel. (310) 772-2261

meshaghian@pessahgroup.com



**IRS Circular 230 Disclosure:** To ensure compliance with requirements imposed by the IRS, please be advised that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**Confidentiality:** This email (including attachments thereto) may contain confidential material, or privileged and/or attorney work product that is for the sole and exclusive use of its intended recipient(s). Review, reliance or distribution by others, or forwarding,for any reason without express permission is strictly prohibited. If you are not the intended recipient(s), please contact the sender immediately and delete all copies. Thank you.

08/18/2015

**PESSAH LAW GROUP, PC**
MAURICE D. PESSAH (SBN: 275955)
maurice@pessahgroup.com
MICHELLE ESHAGHIAN (SBN: 291688)
meshaghian@pessahgroup.com
10100 Santa Monica Bld., Ste. 300
Los Angeles, CA 90067
(310) 772-2261

*Attorneys for Plaintiff*
FITSPOT VENTURES, LLC

FILED
Superior Court of California
County of Los Angeles
AUG 14 2015
Sherri R. Carter, Executive Officer/Clerk
By Annette Fajardo Deputy
Annette Fajardo

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

FITSPOT VENTURES, LLC, a Delaware limited liability company,

Plaintiff,

v.

SOLOMON BIER, an individual; and DOES 1-25, inclusive,

Defendants.

Case No: BC590952
*Assigned to Hon. Barbara A. Meiers*
*Dept. 12*

**DECLARATION OF SAMMY COURTRIGHT IN SUPPORT OF PLAINTIFF FITSPOT VENTURES, LLC'S *EX PARTE APPLICATION* FOR: (1) A TEMPORARY RESTRAINING ORDER AND: (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION.**

**Hearing Date: August 14, 2015**
**Hearing Time: 8:30 a.m.**
**Hearing Dept.: 85**
**Hearing Judge: Hon. James C. Chaflant**

Complaint Filed: August 12, 2015
Trial Date: None Set

1

DECLARATION OF SAMMY COURTRIGHT ISO PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

PESSAH LAW GROUP, PC

**DECLARATION OF SAMMY COURTRIGHT**

I, Sammy Courtright, hereby declare:

1. I am the Director of Operations at FITSPOT VENTURES, LLC ("FITSPOT" or "Company"), the Plaintiff in the above-captioned matter. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could and would testify competently thereto under oath.

2. In my capacity as Director of Operations, I am responsible for customer service and user support. I am intimately familiar with users' complaints regarding the App and have full authority to make decisions in regards to user satisfaction.

3. The Company is entirely deprived of its ability to manage its business: unable to determine if and when users were booking training sessions, unable to pay trainers, unable to repair glitches in the code, unable to modify any component of the App, unable to access its customer information and completely deprived of its ability to access to its own data, trade secrets and intellectual property.

4. Moreover, since Mr. Bier's actions, many users have: (1) been unable to book sessions (Attached hereto as **Exhibit A** are true and correct screenshots of clients' complaints); (2) ceased using the APP and requested refunds (Attached hereto as **Exhibit B** are true and correct screenshots of refund requests); (3) expressed dissatisfaction over the App's failure to properly function (Attached hereto as **Exhibit C** are true and correct screenshots of expressed dissatisfaction over the App).

5. On August 7, 2015, I reported Mr. Bier's actions to the Los Angeles Police Department (LAPD). (Attached as **Exhibit D** is a true and correct copy of the Los Angeles Police Department Investigative Report)

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

//

PESSAH LAW GROUP, PC

2

DECLARATION OF SAMMY COURTRIGHT ISO PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

Executed this 13 day of August, 2015 at Los Angeles, California.

Sammy Courtright, Declarant

PESSAH LAW GROUP, PC

5 1 0 2 / 8 1 / 8 0

3

DECLARATION OF SAMMY COURTRIGHT ISO PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

08/18/2015

EXHIBIT A

AT&T 9:19 PM

Messages Brain Details

Hi I was able to hook we'd and thurs from Adam's availability when it looks like this:

But Friday crashes and the screen only shows availability at muscle mechanics.

August

| SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|
| 26 | 27 | 28 | 29 | 30 | 31 | 01 |
| 02 | 03 | 04 | 05 | 06 | 07 | 08 |
| 09 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | 01 | 02 | 03 | 04 | 05 |

Muscle Mechanics

Muscle Mechanics

08/18/2015

EXA

●●○○○ AT&T 7:43 PM

< Thread 2 of 31

From: **Catherine Just** Hide

To: Sammy

**Re: Fitspot Session**

August 11, 2015 at 7:32 PM

Hi Sammy!

Thank you.

I actually tried to sign up for a package and entered all of my payment info and then the app shut off and took me right to the front screen of my phone.

I tried just doing one session and the same thing happened.

Seems the app doesn't work on my phone.

Not sure how to fix it??

*c

08/18/2015

08/18/2015

EXHIBIT B

 ●●●○○ AT&T

7:57 PM

95%

Messages

**Meredith**

Details

Sunday 3:33 PM

I have a fitspot charge from 8/6 for $61.07

Sunday 4:42 PM

let me check

sorry about that once again. we refunded you

Np thx

Sunday 7:37 PM

Am I seeing you tomorrow?

Yes 6am

Ok see you then

Monday 5:55 AM

Running late sorry

Ok

iMessage

08/18/2015

EX B

Amanda Thomas
To: Sammy
Fwd: Fitspot Appointment Receipt

August 7, 2015 at 1:55 PM
Inbox - Fitspot

AT

Hey Sammy!

Sorry to bug but was my card charged $60? I thought we had 2 free sessions. Let me know!

Amanda Thomas
Luv AJ
www.luyal.com

Sent from my iPhone

Begin forwarded message:

> **From:** Fitspot <contact@fitspotapp.com>
> **Date:** August 7, 2015 at 1:54:18 PM PDT
> **To:** amanda_luyal@mac.com
> **Subject:** Fitspot Appointment Receipt

fit

Appointment Receipt

## Hi Amanda Thomas,

Thank you for sweating with Fitspot. Session overview:

| |
|---|
| Fitspotters: Amanda Thomas |
| Date/Time: Fri, Aug 7, 9:00 AM |
| Trainer: Chelsea Gabrielle |
| Location: 1617 Broadway Santa Monica CA 90404 |
| Training fee: $59.0 |
| Location fee: $0.0 |
| Other (trans. fee & tips & discounts): $-17.93 |
| Total: $41.07 |

Questions, concerns, compliments? Email us at contact@fitspotapp.com

Really sweating? Call us on 323.391.4879
*The Fitspot Team*

08-18-2015

08/18/2015

**EXHIBIT C**

●●●●○ AT&T M-Cell 9:38 PM

< Back (2) mibeminerals@gmail.com Details

That's not cool

I'm sorry you drove out there but they cancelled

Why didn't you try to message them and say anything?

I should have been alerted

You should have been but did you try to chat

Did you have any dialogue with them? Any type of confirmation?

I confirm immediately

I didn't receive anything back from them

With a message?

Regarding canceling

I understand but you didn't receive anything from them

iMessage

08/18/2015

●●○○○ AT&T 9:19 PM 62%

Messages (1) **Group** Details

To: James, Tolland

Your login should be:
UN: Tollandweems@yahoo.com
PW[redacted]

Weems Tolland

TW Ok thanks

Still can't log in with that either

TW I even tried to retrieve password, again.

Wood James

JW Can you try re downloading the app? Have you updated the app?

Weems Tolland

**Updated August 10, 2015**

Domino's Pizza USA
Version 2.8.1, 40.7 MB
What's New ▾
OPEN

Spotify Music
Version 3.7.0, 77.8 MB
What's New ▾
OPEN

iMessage

08/18/2015 

●●ooo AT&T 9:19 PM 62%
Messages (1) Group Details
To: James, Tolland
Your login should be:
UN: Tollandweems@yahoo.com
Weems Tolland
Ok thanks
Still can't log in with that either
I even tried to retrieve password, again.
Wood James
Can you try re downloading the app? Have you updated the app?
Weems Tolland
Updated August 10, 2015
Domino's Pizza USA
Version 2.8.1, 40.7 MB
What's New
OPEN
Spotify Music
Version 3.7.0, 77.8 MB
What's New
OPEN
iMessage
●●ooo AT&T 9:19 PM 62%
Messages (1) Group Details
To: James, Tolland
Log in with Facebook
Unable to login.
Please try again!
Q W E R T Y U I O P
A S D F G H J K L
Z X C V B N M
That's with my yahoo account &
Wood James
I believe you. We are working on figuring out what's going on.
iMessage
●●ooo AT&T 9:19 PM 62%
Messages (1) Group Details
To: James, Tolland
Weems Tolland
I've deleted it, downloaded it, still can't
Tollandweems@yahoo.com
Correct?
Wood James
correct
Weems Tolland
I swear I still can't log in
Log in with Facebook
iMessage

COA-1/15

08/18/2015

EXHIBIT D

Page ___ of ___ 03.01.00

Los Angeles Police Department
**INVESTIGATIVE REPORT**

UCR CODE: ______ COMBINED EVID. REPORT — MULTIPLE DRS ON THIS REPORT

REPORT OF: UNAUTHORIZED ACCESS of COMP. SYSTEM — INVEST DIV. CCD — INC # 15080700 1463 — DR #

**CASE SCREENING FACTOR(S)**
- [ ] SUSPECT/VEHICLE NOT SEEN
- [X] PRINTS OR OTHER EVIDENCE NOT PRESENT
- [ ] MO NOT DISTINCT
- [ ] PROPERTY LOSS LESS THAN $5,000
- [X] NO SERIOUS INJURY TO VICTIM
- [X] ONLY ONE VICTIM INVOLVED

**VICTIM**

| LAST NAME, FIRST, MIDDLE (OR NAME OF BUSINESS) | SEX | DESC | HT | WT | AGE | DOB |
|---|---|---|---|---|---|---|
| FITSPOT | F | W | 5'8 | 120 | — | — |

ADDRESS R- — ZIP PHONE —
B- 507 N HAYWORTH HG LOS ANGELES 90048 —
E-MAIL ADDRESS Sammy@Fitspotapp.com CELL PHONE 303-[illegible]-0777
DR. LIC. NO. (IF NONE, OTHER ID & NO.) F4509019 CA — FOREIGN LANGUAGE SPOKEN — — OCCUPATION DIRECTOR OPERATIONS

**PREMISES** (SPECIFIC TYPE) BUSINESS [ ] ATM

**ENTRY** 459/BFV POINT OF ENTRY — POINT OF EXIT — [ ] FRONT [ ] REAR [ ] SIDE [ ] ROOF [ ] FLOOR [ ] OTHER — METHOD — INSTRUMENT/TOOL USED

LOCATION OF OCCURRENCE: SAME AS V'S [X] RES. [ ] BUS. — R.D. 701 — PRINTS BY PREL. INV. ATTEMPT [ ] Y [X] N OBTAINED [ ] Y [X] N

DATE & TIME OF OCCURRENCE: 08/6/15 0758 — DATE & TIME REPORTED TO PD: 8/7/15 0930

TYPE PROPERTY STOLEN/LOST/DAMAGED [ ] 03.04.00 GIVEN: N/A — STOLEN/LOST $ — — RECOVERED $ — — EST. DAMAGED ARSON / VAND. $ —

**VICT'S VEH.** (IF INVOLVED) YEAR, MAKE, TYPE, COLOR, LIC. NO.: NIV — NOTIFICATION(S) (PERSON & DIVISION): CCD DET. HUNTER 25250 — CONNECTED REPORT(S) (TYPE & DR #)

**MO** IF LONG FORM, LIST UNIQUE ACTIONS. IF SHORT FORM, DESCRIBE SUSPECTS ACTIONS IN BRIEF PHRASES, INCLUDING WEAPON USED. DO NOT REPEAT ABOVE INFO BUT CLARIFY REPORT AS NECESSARY. IF ANY OF THE MISSING ITEMS ARE POTENTIALLY IDENTIFIABLE, ITEMIZE AND DESCRIBE ALL ITEMS MISSING IN THIS INCIDENT IN THE NARRATIVE.

SUSP WAS TERMINATED FROM COMPANY ON 08/05/15. SUSP [illegible]
ACCESS TO CONTROL COMPANY'S COMPUTER SYSTEM W/OUT AUTHORIZATION.

MANDATORY MARSY'S RIGHTS CARD PROVIDED TO THE VICTIM [X] — MOTIVATED BY HATRED/PREJUDICE [ ] — DOMESTIC VIOLENCE [ ]

**REPORTING EMPLOYEE(S)** — INITIALS, LAST NAME: S ANTHONY — SERIAL NO. 41190 — DIV./DETAIL: NIL/[illegible] — PERSON REPORTING SIGNATURE: [signature] — OR RECEIVED BY PHONE [ ]

NOTE: IF SHORT FORM AND VICTIM/PR ARE NOT THE SAME, ENTER PR INFORMATION IN INVOLVED PERSONS SECTION.

**THIS REPORT DOES NOT CONSTITUTE VALID IDENTIFICATION**

**KEEP THIS REPORT FOR REFERENCE. INSTRUCCIONES EN ESPANOL AL REVERSO.**

*Your case will be assigned to a detective for follow-up investigation based upon specific facts obtained during the initial investigation. Studies have shown that the presence of these facts can predict whether a detailed follow-up investigation would likely result in the arrest and prosecution of the suspect(s) or the recovery of property, in a manner that is cost-effective to you, the taxpayer. Significant decreases in personnel have made it impossible for detectives to personally discuss each and every case with all crime victims. A detective will not routinely contact you, unless the detective requires additional information.*

**TO REPORT ADDITIONAL INFORMATION:** If you have specific facts to provide which might assist in the investigation of your case, please contact the detective Monday through Friday, between 8:00 A.M. and 9:30 A.M., or between 2:30 P.M. and 4:00 P.M. at telephone number ______________. If the detective is not available when you call, please leave a message and include the telephone number where you can be reached.

**COPY OF REPORT:** If you wish to purchase a copy of the complete report, phone (213) 486-8130 to obtain the purchase price. Send a check or money order payable to the Los Angeles Police Department to Records and Identification Division, Box 30158, Los Angeles, CA 90030. Include a copy of this report or the following information with your request: 1) Name and address of victims; 2) Type of report and DR number (if listed above); 3) Date and location of occurrence. NOTE: Requests not accompanied by proper payment will not be processed.

**DR NUMBER:** If not entered on this form, the DR number may be obtained by writing to Records and Identification Division and giving the information needed to obtain a copy of the report (see above paragraph). Specify that you only want the DR number. It will be forwarded without delay. There is no charge for this service.

**CREDIT CARDS/CHECKS:** Immediately notify concerned credit corporation or banks to avoid possibility of being liable for someone else using your stolen or lost credit card or check.

**HOW YOU CAN HELP THE INVESTIGATION OF YOUR CASE:**
- Keep this memo for reference.
- If stolen items have serial numbers not available [...] at the listed number.
- If you discover additional losses, complete and m[...]ng employee.
- Promptly report recovery of property.
- Promptly report additional information such as a [...]

DATE: 8/7/15 TIME: 0940 INC. NO.: —

PR ADV BUSINESS DISPUTE REGARD. TERMINATED EMPLOYEE. EMPLOYEE HAS NOT RETURNED COMPANY PROPERTY. ADV TO SEEK CIVIL ACTION. TOOK CRIMINAL RPT FOR UNAUTHORIZED ACCESS TO COMPANY COMPUTER SYSTEM

If you wish to comment on the level of service you received, please contact a Department supervisor or telephone 800-339-6868, or TTY for the hearing-impaired (213) 485-3604.

**VICTIM-WITNESS ASSISTANCE PROGRAM:** The[...]VAP) can help to determine if you qualify for Victim of Violent Crim[...]application. If you are a victim or a witness to a crime and will be going to [...] assist you with other problems created by the crime.

To find the program location nearest to you, call the [...]s Office (213) 485-6976, or the Los Angeles County Distric[...]

**VICTIMS OF VIOLENT CRIME COMPENSATION:** Refer to paragraph at bottom of reverse side.

08/18/2015

9/3

**PESSAH LAW GROUP, PC**
MAURICE D. PESSAH (SBN: 275955)
maurice@pessahgroup.com
MICHELLE ESHAGHIAN (SBN: 291688)
meshaghian@pessahgroup.com
10100 Santa Monica Bld., Ste. 300
Los Angeles, CA 90067
(310) 772-2261

*Attorneys for Plaintiff*
FITSPOT VENTURES, LLC

FILED
Superior Court of California
County of Los Angeles
AUG 14 2015
Sherri R. Carter, Executive Officer/Clerk
By Annette Fajardo Deputy
Annette Fajardo

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

FITSPOT VENTURES, LLC, a Delaware limited liability company,

Plaintiff,

v.

SOLOMON BIER, an individual; and DOES 1-25, inclusive,

Defendants.

Case No: BC590952
*Assigned to Hon. Barbara A. Meiers*
*Dept. 12*

**DECLARATION OF JONATHAN COHN IN SUPPORT OF PLAINTIFF FITSPOT VENTURES, LLC'S *EX PARTE APPLICATION* FOR: (1) A TEMPORARY RESTRAINING ORDER AND: (2) AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION.**

**Hearing Date: August 14, 2015**
**Hearing Time: 8:30 a.m.**
**Hearing Dept.: 85**
**Hearing Judge: Hon. James C. Chaflant**

Complaint Filed: August 12, 2015
Trial Date: None Set

**DECLARATION OF JONATHAN COHN**

I, Jonathan Cohn, hereby declare:

1. I am the Founder and Chief Executive Officer ("CEO") of FITSPOT VENTURES, LLC ("FITSPOT" or "Company"), the Plaintiff in the above-captioned matter. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could and would testify competently thereto under oath.

2. In my capacity as Founder and CEO of the Company I am responsible for managing the day-to-day operations of the Company, including but not limited to, managing employees, overseeing customer service, marketing, and finances. I have full authority to make decisions in regards to all aspects of the Company and am intimately familiar with the Company's operations from its inception.

3. The Company is the creator of "Fitspot," a downloadable mobile application that provides its customers with on-demand access to fitness trainers and classes (the "App"). Upon downloading the App, customers submit their personal contact and health information through the App's interface. That information is then used to optimize the customer's experience, both in terms of best training options and so that fitness professionals can present themselves at a customer's training location of choice. Like the App's customers, fitness professionals also provide their personal information through the App's interface. In turn, the trainers are paid through the App for each session that is booked, and the App takes a small fee for each transaction.

4. An integral component of the App's appeal is the ability to connect customers to fitness professionals instantaneously. Once a customer electronically books a session with a trainer, the trainer immediately receives an "alert" notifying him/her of the customer's name, location, desired workout (i.e., yoga or boxing), and appointment time. The fitness professional has the option to accept or reject the client's request.

5. Like all computer-based technologies of its kind, the App's functionality is powered by a set of underlying programming instructions, or code, that allow the App to deliver on its promise and serve its intended purpose—delivering health and fitness. When the above-described

PESSAH LAW GROUP, PC

2

DECLARATION OF JONATHAN COHN ISO PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) PRELIMINARY INJUNCTION

process is anything but efficient, seamless and reliable, customers complain, cancel subscriptions and/or request refunds. Thus, the Company's ability to modify the underlying code when "glitches" or "bugs" are detected in the App is **crucial**.

6. Solomon Bier was invited to join the Company as a coding engineer and held the title of "Technical Co-Founder." As is typical for early stage development companies, or "startups," Mr. Bier's services were rendered in consideration for an equity stake in the Company. Mr. Bier's equity stake in the Company was governed by a "Founder's Restricted Unit Agreement" (the "RU Agreement"), pursuant to which Mr. Bier was issued "Class B common units of the Company" (the "Restricted Shares") on a specified vesting schedule. (Attached hereto as **Exhibit A** is a true and correct copy of the RU Agreement).

7. Concurrently with his execution of the RU Agreement, and as a condition to his engagement with the Company, Mr. Bier also entered into and executed a "Confidentiality and Intellectual Property Assignment Agreement," (the "Confidentiality Agreement"). (Attached hereto as **Exhibit B** is a true and correct copy of the Confidentiality Agreement) Both the **RU Agreement** and the **Confidentiality Agreement** were fully negotiated and vetted by Mr. Bier and the Company. (Attached hereto as **Exhibit C** is a true and correct copy of correspondences demonstrating the parties' negotiations)

8. Discharging his duties under both the RU Agreement and the Confidentiality Agreement (collectively, the "Agreements"), and with my input, Mr. Bier began developing and writing the "code" that allows the App to function. In order to execute his duties, Mr. Bier was provided with a Company issued laptop, monitor, keyboard and mouse, all of which were purchased by the Company.

9. In developing the code for the App, Mr. Bier relied on subscription-based "cloud platforms" to house and test the functionality and of the App both prior, and subsequent to its release. Mr. Bier, while acting within the scope of the Agreements, created accounts with at least two such providers: (1) Heroku; and (2) Github. On May 4, 2015, Defendant, using his "@fitspotapp.com" email address, sent an email to CEO Jonathan Cohn explaining the work he had

3

DECLARATION OF JONATHAN COHN ISO PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) PRELIMINARY INJUNCTION

PESSAH LAW GROUP, PC

performed on the App using Plaintiff's Heroku account. (Attached hereto as **Exhibit D** is a true and correct copy of a correspondence from Mr. Bier) In the final paragraph of his email he invites CEO Cohn to view and access the "development version" and the "production version" of the App by directing Cohn to two (2) URL hyperlinks inside the Heroku account. (*Id.*) Github is a free service, Heroku is not. All expenses associated with maintaining the Heorku account were at all times and continue to be paid for by the Company. (Attached hereto as **Exhibit E** are true and correct copies of statements from FITSPOT's credit card account) The Company's customer data, proprietary code and App data is all stored in Github and Heroku. Access to the Github and Heroku accounts that store the code and other sensitive data cannot be overstated: it is absolutely essential and the Company cannot properly function without it.

10. Personal contact information of customers is important for maintaining long-term customer relationships, which translates into repeat sales for FITSPOT. The customer data in Mr. Bier's possession and under Mr. Bier's exclusive control contains specific information about a customer's health and fitness goals.

11. In addition to using Heroku and Github to store its data, the Company uses another digital platform known as Slack. Slack is a collaboration tool that facilitates communication between the code repositories – Github and Heroku – and the Company. For example, when a user books a fitness session with a trainer, the Slack platform receives data from Heroku and sends an alert to the Company. This allows the Company to track the amount of bookings it receives and monitor the App's usage. Further, Slack generates automatic notices to the Company if any of the underlying code is modified or altered. If the Heroku and Github accounts are not integrated with Slack, the Company cannot be made aware of modifications to the code or bookings from users. On August 6, 2015, Mr. Bier accessed the Company's Heroku account and intentionally disabled communication between Plaintiff's Heroku and Slack accounts. As a result, since that date, FITSPOT has been unable to determine when one of its customers books a training session through the App. (Attached hereto as **Exhibit F** is a true and correct copy of a page of FITSPOT's Slack account demonstrating that Mr. Bier disabled communication)

4

DECLARATION OF JONATHAN COHN ISO PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) PRELIMINARY INJUNCTION

PESSAH LAW GROUP, PC

12. On August 5, 2015, I terminated Mr. Bier's relationship with the company. My action was ratified by the Company's Board of Directors. (Attached hereto as **Exhibit G** is a true and correct copy of the Unanimous Written Consent of the Board of Directors) I requested from Mr. Bier the return of the Company's tangible and intangible property, including but not limited to, the Company's laptop and other hardware, Mr. Bier's code, consumer data, access credentials to the repositories that house the App's code, and access credentials to all other accounts used by Mr. Bier to discharge his duties. Originally, Mr. Bier agreed to comply with this request.

13. However, Mr. Bier ultimately refused to return any of the above, began changing the passwords to the Heroku and Github accounts, disabled integration between the code repositories and Slack, and become unresponsive to all of the Company's communications. As a result, the Company was entirely deprived of its ability to manage its business: **unable to determine if and when users were booking training sessions, unable to pay trainers, unable to repair glitches in the code, unable to modify <u>any</u> component of the App, unable to access its customer information** and **completely deprived of its ability to access to its own data, trade secrets and intellectual property**.

14. Moreover, since Mr. Bier's nefarious and unlawful actions, many users have: (1) been unable to book sessions; (2) ceased using the APP and requested refunds; (3) expressed dissatisfaction over the App's failure to properly function.

15. To add insult to injury, Mr. Bier has also refused to return a company-issued credit card that he was given for expenses. Alarmingly, the credit card, which bears both the name FITSPOT and BIER, cannot be cancelled without further disrupting the Company's business and customer experience. The credit card information is embedded into the source code that allows customers to use promotional codes for the purpose of booking free sessions. Each time a free session is booked by a newly acquired customer, FITSPOT's credit card is charged. Cancelling the card currently in Mr. Bier's possession would eliminate the possibility of allowing customers to benefit from free promotional sessions, thereby crippling yet another element of FITSPOT's customer experience. Without access the Heroku account, new credit card information is useless, as

PESSAH LAW GROUP, PC

it cannot be added to the source code that facilitates the booking of promotional sessions charged to the card in BIER's possession. It cannot be accessed because BIER has changed the password of FITSPOT's Heroku account. Plaintiff has demanded that Defendant return FITSPOT's property and sensitive data, he refuses.

16. Now, credible information suggests that Defendant is working for another tech company, Honk.com, a downloadable mobile application that provides on-demand service. While Honk's business is unrelated to fitness, Honk may benefit from the on-demand and real time functions of the source code that Defendant developed for Plaintiff. Such code takes many months to develop.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this 13 day of August, 2015 at Los Angeles, California.

Jonathan Cohn, Declarant

PESSAH LAW GROUP, PC

5102/81/80

6

DECLARATION OF JONATHAN COHN ISO PLAINTIFF FITSPOT VENTURES, LLC'S EX PARTE APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER; AND (2) PRELIMINARY INJUNCTION

08/18/2015

**EXHIBIT A**

## FITSPOT VENTURES, LLC

### Founder's Restricted Unit Agreement

Fitspot Ventures, LLC, a Delaware limited liability (the "**Company**") and the Founder hereby agree as follows in connection with the issuance of units of Class B Common Units of the Company specified below (the "**Units**") pursuant to that certain Subscription Agreement dated concurrently herewith (the "**Subscription Agreement**"). The terms and conditions attached hereto are also a part hereof.

| | |
|---|---|
| Name of Founder (the "**Founder**"): | **Solomon Bier** |
| Date: | **January 15, 2015** |
| Number and Class of Units issued pursuant to the Subscription Agreement: | **314,250 Class B Units** |
| Purchase Price per Unit | **S.00001** |
| Number of Shares that are Unvested Shares on the Vesting Start Date: | **314,250** |
| Vesting Start Date: | **December 1, 2014** |

### RECITALS

WHEREAS, pursuant to the Subscription Agreement, the Founder subscribed for 314,250 Class B Units; and

WHEREAS, as a condition to the subscription provided by the Subscription Agreement, the Founder agrees to restrict the Units as more fully described herein.

NOW THEREFORE, in consideration of the premises and of the mutual agreements contained in this Agreement, the parties hereto agree as follows:

### AGREEMENT

All references to unit prices and amounts herein shall be equitably adjusted to reflect unit splits, unit dividends, recapitalizations, mergers, reorganizations and similar changes affecting the limited liability company membership Units of the Company, and any property (including cash or other securities) received on or in respect of the Units (as defined below) in connection with any such event shall be subject to this Agreement on the same basis and extent at the relevant time as the Units in respect of which such property was issued, paid or delivered, and shall be deemed Units for all purposes of this Agreement.

1. **<u>Definitions</u>.** For the purposes of this Agreement, the following terms shall have the meanings specified below. Any other capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the LLC Agreement.

08/18/2015



"Board of Directors" means the Board of Directors of the Company as set forth in the LLC Agreement.

"Business Relationship" means service to the Company or its successor in the capacity of an employee, officer, founder or, if so determined by the Board of Directors, as a consultant or advisor.

An "Affiliate" of any Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the first mentioned Person. A Person shall be deemed to control another Person if such first Person possesses directly or indirectly the power to direct, or cause the direction of, the management and policies of the second Person, whether through the ownership of voting securities, by contract or otherwise.

"Common Units" shall mean the Company's Common Units.

"LLC Agreement" shall mean the Company's Limited Liability Company Agreement dated as of January 15, 2015, as the same may be amended and/or restated from time to time.

"Person" shall mean any individual, corporation, partnership (limited or general), limited liability company, limited liability partnership, association, trust, joint venture, unincorporated organization or any similar entity.

"Restricted Units" shall initially mean 314,250 of the Units held by the Holder as beneficial owner on the date hereof; provided, however, that (i) 31,100 of the Restricted Units shall no longer be Restricted Units and shall be deemed "Vested Units" on the earlier of (i) the date that the Fitspot Mobile Application is completed and released for download in the Apple App Store (the "Release Date"), which release shall be subject to the approval of the Chief Executive Officer of the Company in his sole and absolute discretion and (ii) [December 1, 2015] (the "Cliff Vesting Date"); (ii) 72,622 of the Restricted Units shall become Vested Units on the Cliff Vesting Date and (iii) from and after the Cliff Vesting Date 5,848 of the remaining Restricted Units shall become Vested Units on the last day of each month so that all of Founder Units shall be Vested Units on the date that is four (4) years from the Vesting Start Date unless sooner accelerated in accordance with this Agreement, in each case, so long as the Holder maintains a Business Relationship with the Company as of the date that such Units cease being Restricted Units and become Vested Units hereunder. Notwithstanding the foregoing, except to the extent otherwise provided in this Agreement, in the event of the consummation of a Sale Transaction, one hundred percent (100%) of the then Restricted Units shall immediately cease being Restricted Units and shall become Vested Units hereunder.

"Termination Event" shall mean the termination of the Holder's Business Relationship with the Company for any reason whatsoever, whether or not for cause and regardless of the circumstances thereof, and including without limitation upon death, disability, retirement or discharge or resignation for any reason, whether voluntary or involuntary. Any dispute regarding the Board of Directors' determination of the occurrence of or the reason for termination of the Holder's employment shall be resolved in accordance with Section 4(k) hereof.

"Units" shall mean the number of Class B Common Unit being held by the Holder as beneficial owner on the date hereof, subject to adjustment as described above.

"Vested Units" shall mean all Units which are not Restricted Units.

"Vesting Start Date" shall mean the date that Units begin Vesting, as set forth above.

08/18/2015

2. **Forfeiture Right**. Upon the occurrence of a Termination Event, the Holder and his Permitted Transferees shall automatically, and without any further action on the part of the parties, be deemed to have forfeited all of the Restricted Units that are not Vested Units held by the Holder or such Permitted Transferees (as applicable) as of the date of such Termination Event, after giving effect to any acceleration of vesting described in the definition of Restricted Units above. The Holder and each Permitted Transferee acknowledges and agrees that the Company shall have the authority to record the forfeiture of any Units pursuant to this Section 2 in the books and records of the Company (including the schedules and exhibits to the LLC Agreement) without any action on the part of the Holder or such Permitted Transferee, as applicable.

3. **Restrictions on Transfer of Units.** None of the Restricted Units now owned or hereafter acquired shall be sold, assigned, transferred, pledged, hypothecated, given away or in any other manner disposed of or encumbered, whether voluntarily or by operation of law, except that the Holder (but not any transferee thereof) may sell, assign, transfer or give away any or all of the Restricted Units to Permitted Transferees; provided, however, that such Permitted Transferee(s) shall, as a condition to any such transfer, agree to be subject to the provisions of this Agreement (including, without limitation, the provisions of Section 2 and this Section 3) and shall have delivered a written acknowledgment to that effect to the Company. Transfers of Vested Units may only be affected in accordance with the terms of the LLC Agreement. Any attempted disposition of Units not in accordance with the terms and conditions of this Section 3 or the LLC Agreement shall be null and void, and the Company shall not reflect on its records any change in record ownership of any Units as a result of any such disposition, shall otherwise refuse to recognize any such disposition and shall not in any way give effect to any such disposition of any Units.

4. **Miscellaneous Provisions.**

(a) Section 83(b) Election. The Holder shall consult with the Holder's tax advisor to determine whether it would be appropriate for the Holder to make an election under Section 83(b) of the Internal Revenue Code of 1986, as amended, or any successor federal revenue law (the "Code") with respect to this Agreement. Any such election must be filed with the Internal Revenue Service within 30 days of the date of this Agreement. If the Holder makes an election under Section 83(b) of the Code, the Holder shall give prompt notice to the Company (and provide a copy of such election to the Company).

(b) Record Owner; Distributions. The Holder and any Permitted Transferees, during the duration of this Agreement, shall be considered the record owners of and shall be entitled to vote the Units if and to the extent the Units are entitled to voting rights. The Holder and any Permitted Transferees shall be entitled to receive all distributions declared on the Units; provided, however, that the Company is under no duty make any such distribution.

(c) Equitable Relief. The parties hereto agree and declare that legal remedies are inadequate to enforce the provisions of this Agreement and that equitable relief, including specific performance and injunctive relief, may be used to enforce the provisions of this Agreement.

(d) Change and Modifications. This Agreement may not be orally changed, modified or terminated, nor shall any oral waiver of any of its terms be effective. This Agreement may be changed, modified or terminated only by an agreement in writing signed by the Company and the Holder.

(e) Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to conflict of law principles.

   (f) Headings. The headings are intended only for convenience in finding the subject matter and do not constitute part of the text of this Agreement and shall not be considered in the interpretation of this Agreement.

(g) Saving Clause. If any provision(s) of this Agreement shall be determined to be illegal or unenforceable, such determination shall in no manner affect the legality or enforceability of any other provision hereof.

(h) Notices. All notices, requests, consents and other communications shall be in writing and be deemed given when delivered personally, by telex or facsimile transmission or when received if mailed by first class registered or certified mail, postage prepaid. Notices to the Company or the Holder shall be addressed as set forth underneath their signatures below, or to such other address or addresses as may have been furnished by such party in writing to the other. Notices to any holder of the Units other than the Holder shall be addressed to the address furnished by such holder to the Company.

(i) Benefit and Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors, assigns, and legal representatives.

(j) Counterparts. For the convenience of the parties and to facilitate execution, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

(k) Dispute Resolution. Except as provided below, any dispute arising out of or relating to this Agreement shall be finally settled by binding arbitration conducted expeditiously in accordance with the J.A.M.S./Endispute Comprehensive Arbitration Rules and Procedures (the "J.A.M.S. Rules"). The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. Sections 1-16, and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof. The arbitration shall take place in the state in which the Company's principal office is then located.

(i) The arbitration shall commence within 60 days of the date on which a written demand for arbitration is filed by any party hereto. In connection with the arbitration proceeding, the arbitrator shall have the power to order the production of documents by each party and any third-party witnesses. In addition, each party may take up to three (3) depositions as of right, and the arbitrator may in his or her discretion allow additional depositions upon good cause shown by the moving party. However, the arbitrator shall not have the power to order the answering of interrogatories or the response to requests for admission. In connection with any arbitration, each party to the arbitration shall provide to the other, no later than seven (7) business days before the date of the arbitration, the identity of all persons that may testify at the arbitration and a copy of all documents that may be introduced at the arbitration or considered or used by a party's witness or expert. The arbitrator's decision and award shall be made and delivered within six (6) months of the selection of the arbitrator. The arbitrator's decision shall set forth a reasoned basis for any award of damages or finding of liability. The arbitrator shall not have power to award damages in excess of actual compensatory damages and shall not multiply actual damages or award punitive damages, and each party hereby irrevocably waives any claim to such damages.

(ii) The Company and each of the Holder (each, a "Party") covenants and agrees that such Party will participate in the arbitration in good faith. This Section 4(k) applies equally to requests for temporary, preliminary or permanent injunctive relief, except that in the

08/18/2015

case of temporary or preliminary injunctive relief any party may proceed in court without prior arbitration for the limited purpose of avoiding immediate and irreparable harm.

(iii) Each Party (i) hereby irrevocably submits to the jurisdiction of any United States District Court of competent jurisdiction for the purpose of enforcing the award or decision in any such proceeding, (ii) hereby waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution (except as protected by applicable law), that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court, and (iii) hereby waives and agrees not to seek any review by any court of any other jurisdiction which may be called upon to grant an enforcement of the judgment of any such court. Each Party hereby consents to service of process by registered mail at the address to which notices are to be given. Each Party agrees that its, his or her submission to jurisdiction and its, his or her consent to service of process by mail is made for the express benefit of each other Party. Final judgment against any Party in any such action, suit or proceeding may be enforced in other jurisdictions by suit, action or proceeding on the judgment, or in any other manner provided by or pursuant to the laws of such other jurisdiction.

SIGNATURE PAGE FOLLOWS

IN WITNESS WHEREOF, the Company and the Holder have executed this Restricted Unit Agreement as of the date first above written.

**FITSPOT VENTURES, LLC**

By:______________________________

Name: Jonathan Cohn
Title: President and Chief Executive Officer

Address:
910 N. Martel Ave.
#209
Los Angeles, CA 90046

HOLDER:

______________________________
Name: Solomon Bier

Address:

Solomon Bier
834 4th st.
Apt 110
Santa Monica, CA, 90403

08/18/2015

08/18/2015

EXHIBIT B

**Fitspot Ventures, LLC**
**Confidentiality and Intellectual Property Assignment Agreement**

In consideration and as a condition of my service relationship, whether as an employee, consultant, advisor or otherwise (collectively, "Service Relationship") with, or my continued Service Relationship by, Fitspot Ventures, LLC or any of its subsidiaries (collectively, the "Company"), I, Solomon Bier, agree to the terms and provisions of this Confidentiality and Intellectual Property Assignment Agreement (this "Agreement") as follows:

1. **Confidential Information.**

(a) I agree that all information, whether or not in writing, concerning the Company's business, technology, business relationships or financial affairs which the Company has not released to the general public (collectively, "Confidential Information") is and will be the exclusive property of the Company. Confidential Information also includes information received in confidence by the Company from its customers or suppliers or other third parties. Confidential Information may include, without limitation, information on finance, structure, business plans, employee performance, staffing, compensation of others, research and development, operations, manufacturing and marketing, strategies, customers, files, keys, certificates, passwords and other computer information, as well as information that the Company receives from others under an obligation of confidentiality.

(b) I will not, at any time, without the Company's prior written permission, either during or after my Service Relationship, disclose any Confidential Information to anyone outside of the Company, or use or permit to be used any Confidential Information for any purpose other than the performance of my duties as a service provider of the Company. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure of all Confidential Information. I will deliver to the Company all copies of Confidential Information in my possession or control upon the earlier of a request by the Company or termination of my Service Relationship.

2. **Developments.** (a) I will make full and prompt disclosure to the Company of all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, mask works, databases, computer programs, formulae, techniques, trade secrets, graphics or images, and audio or visual works and other works of authorship (collectively "Developments"), whether or not patentable or copyrightable, are created, made, conceived or reduced to practice, in whole or in part, by me (alone or jointly with others) or under my direction during the period of my Service Relationship to and only to the fullest extent allowed by California Labor Code Section 2870 (which is attached as Appendix A), *provided, however*, that if I am classified by the Company as a consultant, I will be obligated to only make full and prompt disclosure of Company-Related Developments (as defined below) and related Intellectual Property Rights therein (as defined below). I acknowledge that all work performed by me is on a "work for hire" basis, and I hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all my right, title and interest in all Developments that (a) relate to the business of the Company or any customer of or supplier to the Company or any of the products or services being researched, developed, manufactured or sold by the Company or which may be used with such products or services; (b) result from tasks assigned to me by the Company; or (c) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company (collectively, "Company-Related Developments"), and all related patents, patent

0071872015



applications, trademarks and trademark applications, copyrights and copyright applications, and other intellectual property rights in all countries and territories worldwide and under any international conventions ("Intellectual Property Rights").  I understand that to the extent this Agreement is required to be construed in accordance with the laws of any state which precludes a requirement in an employee or other service provider agreement to assign certain classes of inventions made by an employee or other service provider, this paragraph 2 will be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes.

(b)      I will not incorporate, or permit to be incorporated, any Prior Invention (as defined below) in any Company-Related Development without the Company's prior written consent.  A "Prior Invention" is any Development that I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of my Service Relationship with the Company that I consider to be my property or the property of third parties.  If, in the course of my Service Relationship with the Company, I incorporate a Prior Invention into a Company product, process or machine or other work done for the Company, I hereby grant to the Company a nonexclusive, royalty-free, paid-up, irrevocable, worldwide license (with the full right to sublicense) to make, have made, modify, use, sell, offer for sale and import such Prior Invention.

3.      **Enforcement of Intellectual Property Rights.**  I will cooperate fully with the Company, both during and after my Service Relationship with the Company, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in Company-Related Developments.  I will sign, both during and after the term of this Agreement, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development.

4.      **Survival and Assignment by the Company.**  I understand that my obligations under this Agreement will continue in accordance with its express terms regardless of any changes in my title, position, duties, salary, compensation or benefits or other terms and conditions of my Service Relationship. I further understand that my obligations under this Agreement will continue following the termination of my Service Relationship regardless of the manner of such termination and will be binding upon my heirs, executors and administrators.  The Company will have the right to assign this Agreement to its affiliates, successors and assigns.  I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any parent, subsidiary or affiliate to whom I may be transferred without the necessity that this Agreement be reexecuted at the time of such transfer.

5.      **Severability.**  In case any provisions (or portions thereof) contained in this Agreement will, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

6.      **No Service Relationship Obligation.**  I understand that this Agreement does not create an obligation on the Company or any other person to continue my Service Relationship.  I acknowledge that, unless otherwise agreed in a formal written agreement signed on behalf of the Company by an authorized officer, my Service Relationship with the Company is at will and therefore may be terminated by the Company or me at any time and for any reason, with or without cause.

7. **Governing Law.** This Agreement and actions taken hereunder shall be governed by, and construed in accordance with the laws of the State of Delaware, applied without regard to conflict of law principles.

*The remainder of this page is intentionally left blank*

08/18/2015

IN WITNESS WHEREOF, the undersigned has executed this Confidentiality and Intellectual Property Assignment Agreement as of the date set forth below.

Signed: ______________________ Date: 01/20/2015
(sign name above)

Name: Solomon Bier

02/18/2015

APPENDIX A

California Labor Code Section 2870. **Application of provision providing that employee shall assign or offer to assign rights in invention to employer.**

(i) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(A) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(B) Result from any work performed by the employee for his employer.

(ii) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

08/18/2015

08/18/2015

EXHIBIT C



Jonathan Cohn <jonathan.a.cohn@gmail.com>

# Re: FitSpot Follow Up

2 messages

**Jonathan Cohn** <jonathan.a.cohn@gmail.com> Wed, Nov 12, 2014 at 10:49 PM
To: Solomon Bier <sbier@usc.edu>

Hi Solomon,

Thank you for your prompt response and I appreciate the enthusiasm! With regards to your questions below are my quick responses however I am happy to discuss in greater detail on the phone. I have time around 2pm tomorrow if you want to discuss further.

1. I am concluding the process of bringing in investments so the cap table is not finalized at the moment. We are aiming to raise a $100k seed round with a $60k min and $100k Max (10% equity). This is based upon a $1m valuation. There is an additional 1.5%-2% that will be allocated to advisors. I am happy to send you a copy of the term sheet.

2. I am willing to spend about 50% of capital on tech development so between $30-$50k based upon the size of the round. This should provide about a six month runway and support a full time hire and at least one intern. I would like to launch in three months so between $15-20k by launch.

3. I am open to negotiating the various aspects of compensation. As long as we are both on the same page with regards to our budget/runway constraints I am open to this discussion. I want both parties to feel satisfied and excited by Fitspot and its future.

4. 2-3 weeks for a start date should be fine as i need to go through a design process and that will likely take that amount of time.

With regards to design budget I am not exactly sure what the appropriate range would be as I have heard varying numbers. Ideally I would like to keep this number affordable however I do want good quality. What would you expect this type of wireframe to cost based upon your knowledge?

Lastly a couple of additional requests on my end:

1. Would you mind sending over a list of 2-3 references?
2. I have a close friend who is a CTO and he is helping me technically in my start-up process. Would you mind if I scheduled a time for you to speak with him?

Thanks again Solomon and I do appreciate your thorough response. I am happy to speak further and answer any additional questions you may have.

Looking forward to continuing the conversation!

Best,
Jon

----------------------------
Jonathan A. Cohn
203.512.8531
jonathanacohn@gmail.com

On Nov 12, 2014, at 10:10 PM, Solomon Bier <sbier@usc.edu> wrote:

Hi Jon,

EXC

I'll send some messages out and get back to you by the end of the week about a designer for the wireframes. If you have an idea of how much you'd be willing to spend, that will help me find someone for you more quickly. I also have some more questions below. You have a great product, vision and solid domain expertise so I ask these as a vote of confidence as I am seriously considering joining!

1. In terms of where we stand-before I ask for equity it would helpful to see your cap table and understand any Series/Shareholder agreements you've signed to date.

2. You mentioned you had raised some angel funding. How much do you have in the bank? How much is earmarked already? How much is earmarked specifically for development and tech hires (in case I want to add some paid interns, they are insanely cheap but still cost $. Also Heroku, Amazon Web services, & Apple all cost very little but still have some cost that need to be accounted for)? What is your runway? What do you plan to spend by the launch of the app & after?

3. The Angelist profile mentioned a salary from $60k-$100k and ~5% equity. For me the equity is a little on the lower side, so are you willing to negotiate on that end? Also I assume the salary is based off launch dates, and I'm willing to structure my compensation so payments are based off the launch of the app to align incentives.

4. Finally, when is the latest I can start? While I'd love to start ASAP, I'd like ~3 weeks to give my notice. Given that an app of yours should take around 3 months to build, that means a launch date of mid February (given full grind hours-something I'm very used to but I want to make you aware of).

--
Best,
Solomon Bier

---

**Jonathan Cohn** <jonathan.a.cohn@gmail.com> Thu, Nov 13, 2014 at 9:30 PM
To: Solomon Bier <sbier@usc.edu>

Hi Solomon,

As promised attached is the Fitspot Term Sheet. Please let me know if you have any further questions.

Best,
Jon

On Thu, Nov 13, 2014 at 5:14 PM, Jonathan Cohn <jonathan.a.cohn@gmail.com> wrote:

> Hi Solomon,
>
> No problem I will send over the term sheet shortly. I will also send out an intro email connecting you with my friend Ron Lin. The two of you can then setup a time to chat in the upcoming days.
>
> If you would not mind could you also send over a copy of your resume when you send over the references?
>
> Thanks for the wire-framing info and I am happy to chat with any of your designer contacts once you have a chance to reach out.
>
> Speak soon.
>
> Best,
> Jon
>
> ---
> Jonathan A. Cohn

203.512.8531
jonathanacohn@gmail.com

On Nov 13, 2014, at 4:59 PM, Solomon Bier <sbier@usc.edu> wrote:

Jon,

If you could send a copy of the term sheet that would be very helpful, and we can negotiate further on compensation at the next step.

I'll send some references over tonight & I'd be happy to speak with your friend.

As for the wireframes, I'll check on this, but if I remember correctly its typically $40-$75 an hour and for the size of your project it will likely take 10-20 hours because its just a mobile application with what looks like ~20 slides total. You can also just have the designer wireframe the MVP to reduce the cost.

Best,
Solomon Bier

[Quoted text hidden]
--
Best,
Solomon Bier

--
Jonathan A. Cohn
203.512.8531

---

**Fitspot Term Sheet.pdf**
100K

08/18/2015

Solomon Bier

Concerns With Current Proposal

**Below is the first definition where I am excluded from current book value of company:**

"**Class B Unit**" means a Unit that entitles a Class B Member to all of the rights and privileges of an owner of Class B Units as set forth in this Agreement.

"**Class C Member**" means a Member who or which is the owner of a Class C

Unit.

"**Class C Unit**" means a Unit that entitles a Class C Member to all of the rights and privileges of an owner of Class C Units as set forth in this Agreement. The Class C Units have an interest in the profits of the Company only; at the time the Class C Units are issued, they will include no interest in the capital of the Company, and a Class C Member's Capital Account will be credited only by the profits allocated to the owner following the issuance of the Class C Units. The Class C Units constitute Employee Equity and are intended to be profits interests within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343, as clarified by Rev. Proc. 2001-43, 2001-2 C.B. 191.

**Here I am not given right to vote on director of the board**

umber of Directors; Term of Office.

(i) The authorized number of Directors on the Board shall initially be two (2) individuals. At any time prior to a Board Change Event (as defined below), if ever, the Directors on the Board shall consist of the following: (A) one Director nominated and approved by vote of the holders of a majority of the Class A Units (such person, the "**Class A Designee**") and (B) one Director nominated and approved by vote of the holders of a majority of the Class B Units outstanding (such person, the "**Class B Designee**"). At any time after a Board Change Event, if ever, the Directors on the Board shall consist of the following: (A) one Director nominated and approved by vote of the holders of a majority of the New Investors (such person, the "**Investor Designee**") and (B) the Class B Designee. The initial Class A Designee shall be

[__________] and the initial Class B Designee shall be Jonathan Cohn.

(ii) For purposes of this Section 3.1 a "Board Change Event" shall mean the consummation of a financing transaction of the Company in which a new investor contributes at least $100, 000 to the Company (a "New Investor") and the majority of the Class B

Unit holders vote to elect such New Investor a board seat to replace the Class A Designee.

C0712021

**And here my voting rights vest over time, whereas co-founder Jon Cohen's voting rights do not. This is in direct contrast to the reverse vesting schedule discussed**

4.2 **Voting Rights**. Except as otherwise required by applicable law, for all purposes hereunder, each Member shall be entitled to one vote per Unit held by such Member; provided that notwithstanding the foregoing, Class C Units that have not vested in accordance with the terms of the applicable Grant Agreement shall not have any voting rights. A Member which owns Units may vote or be present at a meeting either in person or by proxy.

**Here I am third in seniority in the cap table. Hurdle amount applied to me = 0**

(a) Except as required by **Section 7.3**, all distribution shall be made in the

following order and priority:

(i) *First*, to each holder of Class A Units, in proportion to their respective Unreturned Capital Contributions, until each such holder's Unreturned Capital Contributions shall have been reduced to zero;

(ii) *Second*, to each holder of Class B Units, in proportion to their respective Class B Units, until the aggregate amount distributed under this **Section 7.2(a)(ii)** is equal to the amount distributed under **Section 7.2(a)(i)**;

(iii) *Thereafter*, to the holders of Class A Units, Class B Units and Class C Units in proportion to the respective number of Units held by each of them.

(b) Notwithstanding the foregoing, holders of Class C Units that are subject to a Hurdle Amount will not be entitled to receive any distributions pursuant to **Section 7.2(a)(iii)** in respect of such Class C Units until the aggregate distributions by the Company in respect of all

25

other Units outstanding at the time of the issuance of such Class C Units exceeds the Hurdle Amount applicable to such Class C Units, if any (in which case, such holders of Class C Units will only be entitled to participate in such distributions with respect to such Class C Units to the extent of such excess notwithstanding anything to the contrary herein). No distributions shall be made with respect to any Employee Equity that is unvested, except for distributions required by **Section 7.3**.

08/18/2015

08/18/2015

**EXHIBIT D**

**From:** Jonathan Cohn
**To:** Pessah Maurice
**Subject:** Fwd: Our first Internal Tool - Google Maps Web App For Sessions
**Date:** Friday, August 7, 2015 10:33:18 AM

---

**Jonathan Cohn**
Founder & CEO @ **Fitspot**
203.512.8531

Begin forwarded message:

**From:** Solomon Bier <sol@fitspotapp.com>
**Subject: Our first Internal Tool - Google Maps Web App For Sessions**
**Date:** May 4, 2015 at 2:00:39 AM PDT
**To:** Jonathan Cohn <jonathan@fitspotapp.com>, James Wood <james@fitspotapp.com>
**Cc:** Sammy <sammy@fitspotapp.com>

Team,

This weekend I put together our first internal tool- a google maps web app for session booked by our customers. You guys have asked me who has been booking sessions, when, where, etc. While Braintree tracks the customers who books sessions and there amounts, it doesn't provide any internal information that we track about session details. So instead of relying on me or braintree, you guys can use the below.

The map works in three ways. It reloads every 15 seconds to display all current sessions that are either:

1. PENDING (requested by a user but not confirmed by anyone). **These show up as red icons**
2. CONFIRMED (trainer accepted but the sessions has not been finished/completed by the trainer). **These show as green icons**
3. COMPELTED (trainer finished the session but we have not finished a session). The user has 24 hours after a trainer completes a session to rate and tip the trainer. If not we charge them .If you see old sessions past 24 hours in this state than contact me ! It means we haven't collected payment (or have but didn't mark that we did). **These show as blue icons**

Sessions that have been completed and customer successfully charged WILL NOT show up.



Hovering over an icon shows the Customer name and mobile #. Clicking an icon shows the full session details (trainer, mobile #, address, time, gym, etc.)

I even used the Fitspot map color that Robert made for us to make the map look custom. This is the type of web stuff we can start branding and showing gyms

You can see the development version here:
http://evening-stream-4982.herokuapp.com/admins/map

The actual production version is here (we have no sessions so it will be empty for the time being, but hopefully not too long):
http://fitspot-production.herokuapp.com/admins/map
**** This is working but I need to buy us another license so it may not work in production for 24 hours.**

BOOKMARK THESE PAGES !!!

**Solomon Bier**
Technical Co-Founder @ **Fitspot**
201.621.2248

08/18/2015

08/18/2015

EXHIBIT E

Ink from CHASE

P.O. BOX 15123
WILMINGTON, DE
19850-5123

| | |
|---|---|
| **Payment Due Date:** | **07/17/15** |
| **New Balance:** | **$6,690.50** |
| **Minimum Payment:** | **$66.00** |

93069 BEX 9 17415 C
JONATHAN A COHN
FITSPOT VENTURES, LLC
910 N MARTEL AVE APT 209
LOS ANGELES CA 90046-6654

Make your check payable to: Chase Card Services

CARDMEMBER SERVICE
PO BOX 94014
PALATINE IL 60094-4014

**BUSINESS CARD STATEMENT**

Manage your account online: www.chase.com/businesscards

Customer Service: 1-800-346-5538

Mobile: Visit chase.com on your mobile browser

## ACCOUNT SUMMARY

**Account Numb**

| | |
|---|---|
| Previous Balance | |
| Payment, Credits | -$5,751.04 |
| Purchases | +$6,899.89 |
| Cash Advances | $0.00 |
| Balance Transfers | $0.00 |
| Overdrafts | $0.00 |
| Fees Charged | $0.00 |
| Interest Charged | $0.00 |
| New Balance | $6,690.50 |
| Opening/Closing Date | 05/24/15 - 06/23/15 |
| Revolving Credit Amount | $12,500 |
| Available Credit | $5,809 |
| Cash Access Line | $2,500 |
| Available for Cash | $2,500 |
| Past Due Amount | $0.00 |
| Balance over the Credit Access Line | $0.00 |

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | $6,690.50 |
| Payment Due Date | 07/17/15 |
| Minimum Payment Due | $66.00 |

**Late Payment Warning:** If we do not receive your minimum payment by the due date, you may have to pay up to a $39 late fee.

**Minimum Payment Warning:** Enroll in Auto-Pay and avoid missing a payment. To enroll, call the number on the back of your card or go to the web site listed above.

## YOUR ACCOUNT MESSAGES

As of 6/16/15 we're changing the way we allocate payments. When you make a payment generally we first apply your minimum payment to the balance on your monthly statement with the lowest APR. Any payment above your minimum payment will generally then be applied to the balance on your monthly statement with the highest APR first.

You have one or more balance(s) with APR expiration dates, as shown in the Interest Charge section. These APRs will continue through your billing cycle ending with the expiration month and year shown in the Interest Charge section. You must continue to make your required Minimum Payment Due in order to continue to receive applicable APRs.

## CHASE ULTIMATE REWARDS® SUMMARY

| | |
|---|---|
| Previous points balance | 40,288 |
| + 1 Point per $1 earned on all purchases | 6,691 |
| + Points for Ultimate Rewards travel | 0 |
| + 4 Pts per $1 internt,cable,phone,ofc sply | 544 |
| + 1 Point per $1 on gas stns & restaurants | 197 |
| = Total points available for redemption | 47,720 |

## ACCOUNT ACTIVITY

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| 06/04 | Payment Thank You - Web | -5,541.65 |
| 05/22 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/23 | DNH*GODADDY.COM 480-5058855 AZ | 8.99 |
| 05/22 | RAINLOCAL.COM 800-431-5015 CA | 750.00 |
| 05/24 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/24 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/24 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/24 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/25 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/26 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/26 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |

EX E

**Address Change Request**

Please provide information below only if the address information on front is incorrect.

Street Address: _____

City: _____

State: _ _   Zip: _ _ _ _ _   _ _ _ _

*Home Phone: _ _ _   _ _ _   _ _ _ _     *Work Phone: _ _ _   _ _ _   _ _ _ _

E-mail Address: _____

*When you give us your mobile phone number, we have your permission to contact you at that number about all your Chase or J.P. Morgan accounts. Your consent allows us and companies working on our behalf to use text messaging, artificial or prerecorded voice messages and automatic dialing technology for informational and account service calls, but not for telemarketing or sales calls. Message and data rates may apply. You may contact us anytime to change these preferences.

---

### To contact us regarding your account:

| By Telephone: | | | |
|---|---|---|---|
| In U.S. | 1-800-346-5538 | **Send Inquiries to:** | **Mail Payments to:** | **Visit Our Website:** |
| Español | 1-888-795-0574 | P.O. Box 15298 | P.O. Box 94014 | www.chase.com/businesscards |
| TTY | 1-800-955-8060 | Wilmington, DE 19850-5298 | Palatine, IL 60094-4014 | |
| Pay by phone | 1-800-436-7958 | | | |
| Outside U.S. call collect | | | | |
| | 1-480-350-7099 | | | |



---

**Information About Your Account**

**Crediting of Payments:** You may make payments by any of the options listed below. The amount of your payment should be at least your minimum payment due, payable in U.S. dollars and drawn or payable through a U.S. financial institution or the U.S. branch of a foreign financial institution.

You may make payments by regular U.S. mail. Send your payment to the Payments address shown on this statement. Your payments by mail must comply with the instructions on this statement. Do not send cash. Write your Account number on your check or money order. Payments must be accompanied by the payment coupon in the envelope provided with our address visible through the envelope window; the envelope cannot contain more than one payment or coupon; and there can be no staples, paper clips, tape or correspondence included with your payment. If your payment is in accordance with our payment instructions and is made available to us on any day by 5:00 p.m. local time at our Payments address on this statement, we will credit the payment to your Account as of that day. If your payment is in accordance with our payment instructions, but is made available to us after 5:00 p.m. local time at the Payments address on this statement, we will credit it to your Account as of the next calendar day.

You may make payments electronically through our website shown on this statement. If we receive your completed request on our website by 8 p.m. Eastern Time, we will credit your payment as of that day. If we receive your request after 8 p.m. Eastern Time, we will credit your payment as of the next calendar day. If you specify a future date in your request we will credit your payment as of that day.

For all other payments or for any payment type above for which you do not follow our payment instructions, crediting of your payments may be delayed for up to 5 days.

**Account Information Reported to Credit Bureaus:** We may report information about your Account to credit bureaus. Late payments, missed payments or other defaults on your Account may be reflected in your credit report. If you think we have reported inaccurate information to a credit bureau, you may write to us at the Inquiries address shown on this statement.

**Notice About Electronic Check Conversion:** When you pay by check, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution. Call the Customer Service number on this statement if you have questions about electronic check collection or do not want your payments collected electronically.

**Conditional Payments:** Any payment check or other form of payment that you send us for less than the full balance due that is marked "paid in full" or contains a similar notation, or that you otherwise tender in full satisfaction of a disputed amount, must be sent to Card Services, P.O. Box 15049, Wilmington, DE 19850-5049. We reserve all our rights regarding these payments (e.g., if it is determined there is no valid dispute or if any such check is received at any other address, we may accept the check and

you will still owe any remaining balance). We may refuse to accept any such payment by returning it to you, not cashing it or destroying it. All other payments that you make should be sent to the regular Payment address shown on this statement.

**Annual Renewal Notice:** If your Account Agreement has an annual membership fee and/or similar charge for issuance or availability of your account, it will be billed each year or in monthly or quarterly installments. This fee and/or charge are owed whether or not you use your Account, and you agree to pay them when billed. The annual fee and charge are non-refundable unless you notify us that you wish to close your account within 30 days or one billing cycle (whichever is less) after we provide the statement on which the annual fee or charge is billed and at the same time, you pay your outstanding balance in full. If you do this, for a charge billed more often than annually such as a monthly service charge, you will not owe the last billed charge; however, prior billed charges are non-refundable and must be paid as part of paying your outstanding balance in full. Your payment of the annual fee or charge does not affect our rights to close your Account and to limit your right to make transactions on your Account. If your Account is closed by you or us, we will continue to impose the annual fee and/or charge until you pay your outstanding balance in full and terminate your Account relationship.

**Calculation of Balance Subject to Interest Rate:** To figure your periodic interest charges for each billing cycle when a daily periodic rate(s) applies, we use the daily balance method (including new transactions). To figure your periodic interest charges for each billing cycle when a monthly periodic rate(s) applies, we use the average daily balance method (including new transactions). For an explanation of either method, and questions about a particular interest charge calculation on your statement, please call us at the toll free customer service phone number listed above.

We calculate periodic interest charges, using the applicable periodic rates shown on this statement, separately for each feature (e.g., balance transfer checks and cash advance checks ("check transaction"), purchases, balance transfers, cash advances, promotional balances or overdraft advances). These calculations may combine different categories with the same periodic rates. Variable rates will vary with the market based on the Prime Rate (or such index described in your Account Agreement). There is a transaction fee for each balance transfer, cash advance, or check transaction, in the amounts stated in your Account Agreement, as it may be amended. There is a foreign transaction fee of 3% of the U.S. dollar amount of any foreign transaction (or such amount described in your Account Agreement).

**Interest Accrual**

We accrue periodic interest charges on a transaction, fee or interest charge from the date it is added to your daily balance until payment in full is received on your account.

**Payment Allocation**

When you make a payment, generally, we first apply your minimum payment to the balance on your monthly statement with the lowest APR. Any payment above your minimum payment would generally then be applied to the balance on your monthly statement with the highest APR first. If you do not pay your balance in full each month, you may not be able to avoid interest charges on new purchases.



DA062015.indd

## ACCOUNT ACTIVITY (CONTINUED)

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| 05/27 | UBER 866-576-1039 CA | 17.01 |
| 05/27 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/27 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/27 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/28 | CHICAGO ELITE 3 CHICAGO IL | 9.45 |
| 05/28 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/27 | CHI TAXI 1583 CHICAGO IL | 43.76 |
| 05/28 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/28 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/29 | UBER 866-576-1039 CA | 4.64 |
| 05/28 | ORGANIC LIFE LLC CHICAGO IL | 9.37 |
| 05/31 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/29 | YELLOW CARD SERVICES INC 415-8394600 CA | 8.90 |
| 05/31 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/31 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/31 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/31 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/31 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/31 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/30 | LEMONADE LOS ANGELES CA | 11.94 |
| 05/31 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 05/31 | NAPA FARMS MARKET SAN FRANCISCO CA | 9.95 |
| 06/01 | UBER 866-576-1039 CA | 29.25 |
| 06/03 | RHONEAPPARE 2037225420 CT | 1,252.50 |
| 06/03 | LINKEDIN-277*5237973 LINKEDIN.COM CA | 79.99 |
| 06/04 | CITY OF B H PARKING METER BEVERLY HILLS CA | .50 |
| 06/04 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/05 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/05 | IVY 617-800-3727 NY | 20.00 |
| 06/06 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/06 | Dropbox*1NQL5S871CSJ db.tt/cchelp CA | 9.99 |
| 06/05 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 08/05 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/08 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/09 | SUNSET MILLENNIUM #Q96 WEST HOLLYWOO CA | .75 |
| 06/09 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/09 | STK*SHUTTERSTOCK, INC. 866-663-3954 NY | 49.00 |
| 06/10 | CITY OF B H PARKING METER BEVERLY HILLS CA | .50 |
| 06/10 | CITY OF B H PARKING METER BEVERLY HILLS CA | 1.50 |
| 06/10 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/10 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/11 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/11 | USPS054504957022006415 LOS ANGELES CA | 9.80 |
| 06/11 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/11 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 08/11 | PAYPAL *METALINTERN 402-935-7733 CA | 100.00 |
| 06/11 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/11 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/11 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/13 | UNITED OIL #48 LOS ANGELES CA | 37.17 |
| 06/12 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/14 | SUNSET MILLENNIUM #Q96 WEST HOLLYWOO CA | .75 |
| 06/14 | SUNSET MILLENNIUM #Q96 WEST HOLLYWOO CA | .75 |
| 06/14 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/14 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/15 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/15 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |

## ACCOUNT ACTIVITY (CONTINUED)

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | .30 |
| 06/19 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/20 | BT FITSPOT D2MPB2 323-391-4879 CA | 61.07 |
| | JONATHAN A COHN | |
| | TRANSACTIONS THIS CYCLE (CARD 3523) -$566.52 | |
| | INCLUDING PAYMENTS RECEIVED | |
| 06/07 | APPLE STORE #R051 SANTA MONICA CA | -86.51 |
| 05/19 | BRITISH A 1258526096690 LONDON | 22.40 |
| | 052715 1 P LAX ORD | |
| | 2 P ORD LAX | |
| | 3 X LAX XXX | |
| | 4 X XXX XXX | |
| 05/27 | HUDSON NEWS CARSON CA | 17.20 |
| 05/27 | ADOBE *PHOTOGPHY PLAN 800-833-6687 CA | 9.99 |
| 05/31 | FACEBOOK 3AZ6F72EB2 650-6187714 CA | 2.18 |
| 05/31 | SQUARESPACE INC. 646-580-3456 NY | 10.00 |
| 06/04 | APPLE STORE #R051 SANTA MONICA CA | 86.51 |
| 06/09 | Dropbox*1V4C6KKWDPX5 db.tt/cchelp CA | 9.99 |
| 06/11 | HEROKU 866-278-1349 CA | 157.80 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | 73.28 |
| | SOLOMON BIER | |
| | TRANSACTIONS THIS CYCLE (CARD 2086) $302.84 | |
| 06/12 | LA CITY METERED PARKING LOS ANGELES CA | -3.00 |
| 05/24 | LA CITY PARKING METER LOS ANGELES CA | 4.00 |
| 05/24 | LA CITY PARKING METER LOS ANGELES CA | 4.00 |
| 05/23 | BEACH/POF LOT PARKIN SANTA MONICA CA | 2.00 |
| 05/23 | BEACH/POF LOT PARKIN SANTA MONICA CA | 2.00 |
| 05/29 | WEHO Street Meters WEST HOLLYWOO CA | .75 |
| 06/03 | CHEVRON 00091410 PASADENA CA | 38.87 |
| 06/05 | LA CITY METERED PARKING LOS ANGELES CA | .50 |
| 06/05 | LA CITY METERED PARKING LOS ANGELES CA | 3.00 |
| 06/09 | LA CITY METERED PARKING LOS ANGELES CA | 3.00 |
| 06/10 | LA CITY PARKING METER LOS ANGELES CA | .50 |
| 06/10 | CHEVRON 00091410 PASADENA CA | 49.35 |
| 06/11 | LA CITY PARKING METER LOS ANGELES CA | 2.00 |
| 06/11 | LA CITY PARKING METER LOS ANGELES CA | 2.00 |
| 06/12 | CITY OF B H PARKING METER BEVERLY HILLS CA | 1.75 |
| 06/17 | LA CITY PARKING METER LOS ANGELES CA | 1.00 |
| 06/17 | LA CITY PARKING METER LOS ANGELES CA | .25 |
| 06/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/18 | LA CITY METERED PARKING LOS ANGELES CA | 8.00 |
| 06/19 | SM CITY PARKING METERS SANTA MONICA CA | .25 |
| 06/19 | SM CITY PARKING METERS SANTA MONICA CA | .25 |
| 06/21 | 76 10070761 MALIBU CA | 39.74 |
| 06/22 | AMAZON MKTPLACE PMTS AMZN.COM/BILL WA | 81.98 |
| 06/22 | AMAZON MKTPLACE PMTS AMZN.COM/BILL WA | 118.31 |
| 06/22 | AMAZON MKTPLACE PMTS AMZN.COM/BILL WA | 118.31 |
| | JAMES WOOD | |
| | TRANSACTIONS THIS CYCLE (CARD 4503) $539.88 | |
| 06/05 | HOOTSUITE MEDIA INC. 778-588-9767 CA | -119.88 |
| 05/21 | SLB PRINTING INC LOS ANGELES CA | 414.20 |
| 05/24 | HOOTSUITE MEDIA INC. 778-588-9767 CA | 119.88 |
| 05/28 | SLB PRINTING INC LOS ANGELES CA | 215.28 |
| 06/13 | TWC*TIME WARNER CABLE 888-TWCABLE CA | 91.93 |
| 06/19 | SQ *KAL TOBE PRESS LOS ANGELES CA | 136.25 |
| 06/19 | MEETUP.COM 877-633-8870 NY | 14.99 |
| | SAMANTHA COURTRIGHT | |
| | TRANSACTIONS THIS CYCLE (CARD 4357) $872.65 | |

**BUSINESS CARD STATEMENT**

Manage your account online: www.chase.com/businesscards

Customer Service: 1-800-346-5538

Mobile: Visit chase.com on your mobile browser

| 2015 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2015 | $39.00 |
| Total interest charged in 2015 | $0.00 |

Year-to-date totals do not reflect any fee or interest refunds you may have received.

## INTEREST CHARGES

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Balance Type | Annual Percentage Rate (APR) | Expiration Date | Balance Subject To Interest Rate | Interest Charges |
|---|---|---|---|---|
| **PURCHASES** | | | | |
| Introductory Purchases | 0.00% | 12/2015 | -0- | -0- |
| Purchases | 13.24% (v) | - | -0- | -0- |
| **CASH ADVANCES** | | | | |
| Cash Advances | 19.24% (v) | - | -0- | -0- |
| **BALANCE TRANSFERS** | | | | |
| Introductory Balance Transfers | 0.00% | 12/2015 | -0- | -0- |
| Balance Transfers | 13.24% (v) | - | -0- | -0- |
| **OVERDRAFTS** | | | | |
| Overdraft Advances | 19.24% (v) | - | -0- | -0- |

(v) = Variable Rate

**31 Days in Billing Period**

Please see Information About Your Account section for the Calculation of Balance Subject to Interest Rate, Annual Renewal Notice, How to Avoid Interest on Purchases, and other important information, as applicable.

JONATHAN A COHN
0000001 FIS33339 C 1 000 Y 9 23 15/06/23

Page 4 of 4
Page 4 of 4

Statement Date: 06/23/15
00225 MA DA 93069 17410000010009306903

08/18/2015

CHASE
P.O. BOX 15123
WILMINGTON, DE
19850-5123

**Payment Due Date:** 08/17/15
**New Balance:** $11,227.71
**Minimum Payment:** $112.00

Account numbe

$ ________ Amount Enclosed

Make your check payable to: Chase Card Services

96319 BEX 9 20415 C
JONATHAN A COHN
507 N HAYWORTH AVE
APT 6
LOS ANGELES CA 90048-2726

CARDMEMBER SERVICE
PO BOX 94014
PALATINE IL 60094-4014

**BUSINESS CARD STATEMENT**

Manage your account online: www.chase.com/businesscards
Customer Service: 1-800-346-5538
Mobile: Visit chase.com on your mobile browser

## ACCOUNT SUMMARY

**Account Number:**

| | |
|---|---|
| Previous Balance | .30.50 |
| Payment, Credits | -$6,690.50 |
| Purchases | +$11,227.71 |
| Cash Advances | $0.00 |
| Balance Transfers | $0.00 |
| Overdrafts | $0.00 |
| Fees Charged | $0.00 |
| Interest Charged | $0.00 |
| New Balance | $11,227.71 |
| Opening/Closing Date | 06/24/15 - 07/23/15 |
| Revolving Credit Amount | $12,500 |
| Available Credit | $1,272 |
| Cash Access Line | $2,500 |
| Available for Cash | $1,272 |
| Past Due Amount | $0.00 |
| Balance over the Credit Access Line | $0.00 |

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | $11,227.71 |
| Payment Due Date | 08/17/15 |
| Minimum Payment Due | $112.00 |

**Late Payment Warning:** If we do not receive your minimum payment by the due date, you may have to pay up to a $39 late fee.

**Minimum Payment Warning:** Enroll in Auto-Pay and avoid missing a payment. To enroll, call the number on the back of your card or go to the web site listed above.

## YOUR ACCOUNT MESSAGES

As of 6/16/15 we've changed the way we allocate payments. When you make a payment generally we first apply your minimum payment to the balance on your monthly statement with the lowest APR. Any payment above your minimum payment will generally then be applied to the balance on your monthly statement with the highest APR first.

You have one or more balance(s) with APR expiration dates, as shown in the Interest Charge section. These APRs will continue through the expiration dates shown in the Interest Charges section.

## CHASE ULTIMATE REWARDS® SUMMARY

| | |
|---|---|
| Previous points balance | 47,720 |
| + 1 Point per $1 earned on all purchases | 11,228 |
| + Points for Ultimate Rewards travel | 0 |
| + 4 Pts per $1 internt,cable,phone,ofc sply | 860 |
| + 1 Point per $1 on gas stns & restaurants | 154 |
| - Points redeemed this statement period | 31,201 |
| = Total points available for redemption | 28,761 |

## ACCOUNT ACTIVITY

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| 07/09 | Payment Thank You - Web | -6,690.50 |
| 06/22 | WEHO Street Meters WEST HOLLYWOO CA | 1.50 |
| 06/23 | DNH*GODADDY.COM 480-5058855 AZ | 8.99 |
| 06/23 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/23 | CITY OF B H PARKING METER BEVERLY HILLS CA | 2.50 |
| 06/24 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/25 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/24 | AMPCO PARKING GILMORE STA LOS ANGELES CA | 2.00 |
| 06/25 | CHEVRON 00098744 WEST HOLLYWOO CA | 41.45 |
| 06/24 | WEHO Street Meters WEST HOLLYWOO CA | 2.50 |
| 06/27 | AMAZON MKTPLACE PMTS AMZN.COM/BILL WA | 38.40 |

Address Change Request

Please provide information below only if the address information on front is incorrect.

Street Address: ______________________________

City: ______________________

State: __ Zip: ______ ____

*Home Phone: ___ ___ ____ *Work Phone: ___ ___ ____

E-mail Address: ______________________________

*When you give us your mobile phone number, we have your permission to contact you at that number about all your Chase or J.P. Morgan accounts. Your consent allows us and companies working on our behalf to use text messaging, artificial or prerecorded voice messages and automatic dialing technology for informational and account service calls, but not for telemarketing or sales calls. Message and data rates may apply. You may contact us anytime to change these preferences.

## To contact us regarding your account:

| By Telephone: | Send Inquiries to: | Mail Payments to: | Visit Our Website: |
|---|---|---|---|
| In U.S. 1-800-346-5538<br>Español 1-888-795-0574<br>TTY 1-800-955-8060<br>Pay by phone 1-800-436-7958<br>Outside U.S. call collect 1-480-350-7099 | P.O. Box 15298<br>Wilmington, DE 19850-5298 | P.O. Box 94014<br>Palatine, IL 60094-4014 | www.chase.com/businesscards |

**Information About Your Account**

**Crediting of Payments:** You may make payments by any of the options listed below. The amount of your payment should be at least your minimum payment due, payable in U.S. dollars and drawn or payable through a U.S. financial institution or the U.S. branch of a foreign financial institution.

You may make payments by regular U.S. mail. Send your payment to the Payments address shown on this statement. Your payments by mail must comply with the instructions on this statement. Do not send cash. Write your Account number on your check or money order. Payments must be accompanied by the payment coupon in the envelope provided with our address visible through the envelope window; the envelope cannot contain more than one payment or coupon; and there can be no staples, paper clips, tape or correspondence included with your payment. If your payment is in accordance with our payment instructions and is made available to us on any day by 5:00 p.m. local time at our Payments address on this statement, we will credit the payment to your Account as of that day. If your payment is in accordance with our payment instructions, but is made available to us after 5.00 p.m. local time at the Payments address on this statement, we will credit it to your Account as of the next calendar day.

You may make payments electronically through our website shown on this statement. If we receive your completed request on our website by 8 p.m. Eastern Time, we will credit your payment as of that day. If we receive your request after 8 p.m. Eastern Time, we will credit your payment as of the next calendar day. If you specify a future date in your request we will credit your payment as of that day.

For all other payments or for any payment type above for which you do not follow our payment instructions, crediting of your payments may be delayed for up to 5 days.

**Account Information Reported to Credit Bureaus:** We may report information about your Account to credit bureaus. Late payments, missed payments or other defaults on your Account may be reflected in your credit report. If you think we have reported inaccurate information to a credit bureau, you may write to us at the Inquiries address shown on this statement.

**Notice About Electronic Check Conversion:** When you pay by check, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution. Call the Customer Service number on this statement if you have questions about electronic check collection or do not want your payments collected electronically.

**Conditional Payments:** Any payment check or other form of payment that you send us for less than the full balance due that is marked "paid in full" or contains a similar notation, or that you otherwise tender in full satisfaction of a disputed amount, must be sent to Card Services, P.O. Box 15049, Wilmington, DE 19850-5049. We reserve all our rights regarding these payments (e.g., if it is determined there is no valid dispute or if any such check is received at any other address, we may accept the check and you will still owe any remaining balance). We may refuse to accept any such payment by returning it to you, not cashing it or destroying it. All other payments that you make should be sent to the regular Payment address shown on this statement.

**Annual Renewal Notice:** If your Account Agreement has an annual membership fee and/or similar charge for issuance or availability of your account, it will be billed each year or in monthly or quarterly installments. This fee and/or charge are owed whether or not you use your Account, and you agree to pay them when billed. The annual fee and charge are non-refundable unless you notify us that you wish to close your account within 30 days or one billing cycle (whichever is less) after we provide the statement on which the annual fee or charge is billed and at the same time, you pay your outstanding balance in full. If you do this, for a charge billed more often than annually such as a monthly service charge, you will not owe the last billed charge; however, prior billed charges are non-refundable and must be paid as part of paying your outstanding balance in full. Your payment of the annual fee or charge does not affect our rights to close your Account and to limit your right to make transactions on your Account. If your Account is closed by you or us, we will continue to impose the annual fee and/or charge until you pay your outstanding balance in full and terminate your Account relationship.

**Calculation of Balance Subject to Interest Rate:** To figure your periodic interest charges for each billing cycle when a daily periodic rate(s) applies, we use the daily balance method (including new transactions). To figure your periodic interest charges for each billing cycle when a monthly periodic rate(s) applies, we use the average daily balance method (including new transactions). For an explanation of either method, and questions about a particular interest charge calculation on your statement, please call us at the toll free customer service phone number listed above.

We calculate periodic interest charges, using the applicable periodic rates shown on this statement, separately for each feature (e.g., balance transfer checks and cash advance checks ("check transaction"), purchases, balance transfers, cash advances, promotional balances or overdraft advances). These calculations may combine different categories with the same periodic rates. Variable rates will vary with the market based on the Prime Rate (or such index described in your Account Agreement). There is a transaction fee for each balance transfer, cash advance, or check transaction, in the amounts stated in your Account Agreement, as it may be amended. There is a foreign transaction fee of 3% of the U.S. dollar amount of any foreign transaction (or such amount described in your Account Agreement).

**Interest Accrual**

We accrue periodic interest charges on a transaction, fee or interest charge from the date it is added to your daily balance until payment in full is received on your account.

**Payment Allocation**

When you make a payment, generally, we first apply your minimum payment to the balance on your monthly statement with the lowest APR. Any payment above your minimum payment would generally then be applied to the balance on your monthly statement with the highest APR first. If you do not pay your balance in full each month, you may not be able to avoid interest charges on new purchases.

DA062015.indd

## ACCOUNT ACTIVITY (CONTINUED)

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| 06/25 | WEHO Street Meters WEST HOLLYWOO CA | 1.00 |
| 06/27 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/26 | BT FITSPOT 5ZTRFG 323-391-4879 CA | 98.00 |
| 06/27 | BT FITSPOT HRS8B2 3233914879 CA | 71.37 |
| 06/28 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/26 | SLB PRINTING INC LOS ANGELES CA | 18.53 |
| 06/28 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/28 | BT FITSPOT 83QTSR 323-391-4879 CA | 61.07 |
| 06/28 | BT FITSPOT FMQQ76 323-391-4879 CA | 71.37 |
| 06/28 | LA CITY PARKING METER LOS ANGELES CA | .50 |
| 06/29 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/29 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/29 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/29 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 06/29 | SUNSET MILLENNIUM #Q96 WEST HOLLYWOO CA | .75 |
| 06/30 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/01 | BT FITSPOT 9TMJDB 323-391-4879 CA | 71.37 |
| 07/01 | WEHO Street Meters WEST HOLLYWOO CA | 1.50 |
| 07/01 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/01 | WEHO Street Meters WEST HOLLYWOO CA | 2.25 |
| 07/01 | BT FITSPOT 85QT5G 323-391-4879 CA | 61.07 |
| 07/01 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/01 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/02 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/02 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/02 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/02 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/03 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/04 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/03 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/04 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/03 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/03 | LINKEDIN-287*7401603 LINKEDIN.COM CA | 79.99 |
| 07/03 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/03 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/05 | BT FITSPOT 9YMMC6 323-391-4879 CA | 71.37 |
| 07/04 | SHELL OIL 57444287908 W HOLLYWOOD CA | 38.36 |
| 07/05 | IVY 617-800-3727 NY | 20.00 |
| 07/06 | Dropbox*8X528R1H2GJL db.tt/cchelp CA | 9.99 |
| 07/08 | BT FITSPOT 9FCHH6 323-391-4879 CA | 61.07 |
| 07/08 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/08 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/08 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/08 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/09 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/09 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/09 | LA CITY PARKING METER LOS ANGELES CA | .75 |
| 07/10 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/09 | SLB PRINTING INC LOS ANGELES CA | 225.63 |
| 07/10 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/11 | PAYPAL *METALINTERN 402-935-7733 CA | 100.00 |
| 07/09 | SLB PRINTING INC LOS ANGELES CA | 215.28 |
| 07/13 | UBER TECHNOLOGIES INC 866-576-1039 CA | 5.35 |
| 07/12 | UBER 866-576-1039 CA | 4.16 |
| 07/12 | UBER 866-576-1039 CA | 4.07 |
| 07/13 | LA CITY PARKING METER LOS ANGELES CA | 2.00 |
| 07/13 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/13 | BT FITSPOT 5ZTRFG 323-391-4879 CA | 74.94 |
| 07/13 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/13 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/14 | LA CITY PARKING METER LOS ANGELES CA | 1.50 |
| 07/14 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/14 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/14 | BLOOM CAFE LOS ANGELES CA | 40.34 |
| 07/14 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/15 | BT FITSPOT 5ZTRFG 323-391-4879 CA | 61.07 |

ACCOUNT ACTIVITY (CONTINUED)

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| 07/15 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/15 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/16 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/15 | SLB PRINTING INC LOS ANGELES CA | 414.20 |
| 07/16 | BT FITSPOT 5ZTRFG 323-391-4879 CA | 61.07 |
| 07/17 | RHONEAPPARE 2037225420 CT | 1,091.00 |
| 07/17 | SLB PRINTING INC LOS ANGELES CA | 715.25 |
| 07/20 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/20 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/22 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/22 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/22 | BT FITSPOT 9YMMC6 323-391-4879 CA | 61.07 |
| 07/22 | JCPENNEY.COM JCPENNEY.COM NV | 1,158.66 |
| | JONATHAN A COHN<br>TRANSACTIONS THIS CYCLE (CARD 3523) $1,191.96<br>INCLUDING PAYMENTS RECEIVED | |
| 06/24 | BT FITSPOT 2W5Z2M 323-391-4879 CA | 51.07 |
| 06/24 | BT FITSPOT 9YMMC6 323-391-4879 CA | 51.07 |
| 06/26 | BT FITSPOT 5SM9JB 323-391-4879 CA | 51.07 |
| 06/27 | INFLIGHT WI-FI - LTV 321-216-3303 FL | 11.97 |
| 06/28 | BT FITSPOT K4B4N6 323-391-4879 CA | 51.07 |
| 06/27 | ADOBE *PHOTOGPHY PLAN 800-833-6687 CA | 9.99 |
| 06/28 | MSFT *OFFICE 800-642-7676 WA | 9.99 |
| 06/29 | BT FITSPOT 7STCBM 323-391-4879 CA | 46.72 |
| 06/30 | BT FITSPOT 9YMMC6 323-391-4879 CA | 51.07 |
| 07/01 | BT FITSPOT 85QT5G 323-391-4879 CA | 47.64 |
| 07/01 | BT FITSPOT FMQQ76 323-391-4879 CA | 51.07 |
| 07/03 | BT FITSPOT 9TMJDB 323-391-4879 CA | 47.64 |
| 07/04 | BT FITSPOT HRS8B2 323-391-4879 CA | 41.53 |
| 07/04 | BT FITSPOT 5ZTRFG 323-391-4879 CA | 47.64 |
| 07/07 | BT FITSPOT 2W5Z2M 323-391-4879 CA | 51.07 |
| 07/08 | BT FITSPOT FMQQ76 323-391-4879 CA | 51.07 |
| 07/09 | BT FITSPOT FMQQ76 323-391-4879 CA | 57.18 |
| 07/09 | BT FITSPOT FMQQ76 323-391-4879 CA | 41.53 |
| 07/09 | BT FITSPOT JYSSBM 323-391-4879 CA | 51.07 |
| 07/09 | BT FITSPOT 33X6ZG 323-391-4879 CA | 51.07 |
| 07/09 | BT FITSPOT K689PW 323-391-4879 CA | 54.12 |
| 07/09 | Dropbox*VN39G811FQCC db.tt/cchelp CA | 9.99 |
| 07/09 | BT FITSPOT K689PW 323-391-4879 CA | 51.07 |
| 07/18 | BT FITSPOT JYSSBM 323-391-4879 CA | 51.07 |
| 07/17 | BT FITSPOT JYSSBM 323-391-4879 CA | 51.07 |
| 07/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | 51.07 |
| 07/17 | BT FITSPOT 9YMMC6 323-391-4879 CA | 51.07 |
| 07/18 | BT FITSPOT 83QTSR 323-391-4879 CA | 51.07 |
| 07/17 | BT FITSPOT 9YMMC6 323-391-4879 CA | 51.07 |
| 07/18 | BT FITSPOT 85QT5G 323-391-4879 CA | 51.07 |
| 07/17 | BT FITSPOT 85QT5G 323-391-4879 CA | 47.64 |
| 07/18 | BT FITSPOT FMQQ76 323-391-4879 CA | 61.37 |
| 07/17 | BT FITSPOT FMQQ76 323-391-4879 CA | 41.53 |
| 07/18 | BT FITSPOT FMQQ76 323-391-4879 CA | 51.07 |
| 07/17 | BT FITSPOT 79Q7TB 323-391-4879 CA | 47.64 |
| 07/18 | BT FITSPOT JYSSBM 323-391-4879 CA | 51.07 |
| 07/17 | BT FITSPOT 33X6ZG 323-391-4879 CA | 51.07 |
| 07/18 | BT FITSPOT 9YMMC6 323-391-4879 CA | 51.07 |
| 07/17 | BT FITSPOT 33X6ZG 323-391-4879 CA | 51.07 |
| 07/18 | BT FITSPOT FMQQ76 323-391-4879 CA | 47.64 |
| 07/19 | BT FITSPOT 9WN8N6 323-391-4879 CA | 41.53 |
| 07/19 | BT FITSPOT 33X6ZG 323-391-4879 CA | 61.37 |
| 07/19 | BT FITSPOT 9YMMC6 323-391-4879 CA | 51.07 |
| 07/19 | BT FITSPOT FMQQ76 323-391-4879 CA | 51.07 |
| 07/19 | BT FITSPOT 8VRY5G 323-391-4879 CA | 61.37 |
| 07/20 | BT FITSPOT JYSSBM 323-391-4879 CA | 41.53 |
| 07/20 | BT FITSPOT 9YMMC6 323-391-4879 CA | 51.07 |
| 07/20 | BT FITSPOT 5ZTRFG 323-391-4879 CA | 41.53 |
| 07/21 | BT FITSPOT FMQQ76 323-391-4879 CA | 41.53 |
| 07/21 | BT FITSPOT F58VPW 323-391-4879 CA | 51.07 |
| 07/21 | BT FITSPOT GMWPB2 323-391-4879 CA | 41.53 |

## ACCOUNT ACTIVITY (CONTINUED)

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| 07/22 | BT FITSPOT JYSSBM 323-391-4879 CA | 51.07 |
| 07/22 | BT FITSPOT 9YMMC6 323-391-4879 CA | 51.07 |
| 07/22 | HEROKU 866-278-1349 CA | 155.00 |
| 07/22 | BT FITSPOT 85QT5G 323-391-4879 CA | 36.34 |
| 07/22 | BT FITSPOT FMQQ76 323-391-4879 CA | 36.34 |
| | SOLOMON BIER | |
| | TRANSACTIONS THIS CYCLE (CARD 2086) $2,710.86 | |
| 06/27 | SP * THE DETOX MARKET LOS ANGELES CA | 7.07 |
| 06/26 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 06/26 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 06/26 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 06/30 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 06/30 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 07/03 | BEACH/POF LOT PARKIN SANTA MONICA CA | 12.00 |
| 07/02 | BH PARKING GARAGES BEVERLY HILLS CA | 1.00 |
| 07/18 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 07/18 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 07/18 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 07/18 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 07/18 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 07/18 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 07/18 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 07/18 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 07/18 | SM CITY PARKING METERS SANTA MONICA CA | 2.00 |
| 07/21 | CHEVRON 00095008 LOS ANGELES CA | 30.00 |
| 07/22 | AMAZON MKTPLACE PMTS AMZN.COM/BILL WA | 14.88 |
| | JAMES WOOD | |
| | TRANSACTIONS THIS CYCLE (CARD 4503) $391.95 | |
| 06/25 | COFFEE COMMISSARY LOS ANGELES CA | 3.45 |
| 07/02 | Dropbox*QKZVFKY3ZJRQ db.tt/cchelp CA | 99.00 |
| 07/14 | TWC*TIME WARNER CABLE 888-TWCABLE CA | 50.00 |
| 07/14 | CRAIGSLIST.ORG 415-399-5200 CA | 25.00 |
| 07/17 | LULULEMON ROBERTSON LOS ANGELES CA | 50.00 |
| 07/19 | MEETUP.COM 877-633-8870 NY | 14.99 |
| | SAMANTHA COURTRIGHT | |
| | TRANSACTIONS THIS CYCLE (CARD 4357) $242.44 | |

| 2015 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2015 | $39.00 |
| Total interest charged in 2015 | $0.00 |

Year-to-date totals do not reflect any fee or interest refunds you may have received.

## INTEREST CHARGES

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Balance Type | Annual Percentage Rate (APR) | Expiration Date* | Balance Subject To Interest Rate | Interest Charges |
|---|---|---|---|---|
| **PURCHASES** | | | | |
| Introductory Purchases | 0.00% | 12/23/15 | -0- | -0- |
| Purchases | 13.24% (v) | - | -0- | -0- |
| **CASH ADVANCES** | | | | |
| Cash Advances | 19.24% (v) | - | -0- | -0- |
| **BALANCE TRANSFERS** | | | | |
| Introductory Balance Transfers | 0.00% | 12/23/15 | -0- | -0- |
| Balance Transfers | 13.24% (v) | - | -0- | -0- |
| **OVERDRAFTS** | | | | |
| Overdraft Advances | 19.24% (v) | - | -0- | -0- |

(v) = Variable Rate

**30 Days in Billing Period**

Please see Information About Your Account section for the Calculation of Balance Subject to Interest Rate, Annual Renewal Notice, How to Avoid Interest on Purchases, and other important information, as applicable.

*If you change your payment due date, the date your promotional rate(s) ends also changes. Please be assured, the promotional rate will last for the time period promised in your offer.

**IMPORTANT NEWS**

Keep up to date when you are on the go.
Log on to chase.com/alerts
to set up your alerts.



08/18/2015

EXHIBIT F

Slack

**Fitspot**
sammycourtright

CHANNELS
analytics
app-bugs
app-v -1 3
appv1 4
appv1 5
# customer_sessions
customerfeedback
general
gilt
herokufitspot
inapp messages
newrelic
papertrialfitspot
promotions
random
trainerfeedback
trello
twilliosms
twitterfitspot
+1 More...

DIRECT MESSAGES
slackbot
*jamesfitspotapp*
jon
*nicoleaquino*
steven

PRIVATE GROUPS
New private group...

+ Invite People

## #customer_sessions

5 Sekhmet

**August 5th, 2015**

On Thu, Aug 6, 11:00 AM
At Muscle Mechanics @ 8471 Beverly Blvd Los Angeles, CA 90048
**Customer Mobile:** 9175198145
Customer Email: leftonian@gmail.com
Trainer Mobile: 323.283.7115
Trainer Email: threesixfive.pt@gmail.com

**SessionBot** BOT 5:17 PM
**Trainer Chelsea Gabrielle**
CONFIRMED a session with **Sammy Courtright**
On Mon, Aug 10, 9:00 AM
At 515 N Hayworth Ave Los Angeles CA 90048
**Customer Mobile:** 3058770277
Customer Email: sammy@courtright.net
Trainer Mobile: 1310770051
Trainer Email: chelcgabrielle@gmail.com

**SessionBot** BOT 7:05 PM
**Amanda Thomas**
CANCELED a session with
**STILL PENDING**
On Fri, Aug 7, 9:00 AM
At 1617 Broadway Santa Monica CA 90404
**Customer Mobile:** 3106145104
Customer Email: amanda_luvaj@mac.com
Trainer Mobile:
Trainer Email:

**Trainer Chelsea Gabrielle**
CONFIRMED a session with **Amanda Thomas**
On Fri, Aug 7, 9:00 AM
At 1617 Broadway Santa Monica CA 90404
**Customer Mobile:** 3106145104
Customer Email: amanda_luvaj@mac.com
Trainer Mobile: 1310770051
Trainer Email: chelcgabrielle@gmail.com

**August 6th, 2015**

**sol** 7:56 AM
*removed an integration from this channel:* **incoming-webhook**

+

08/18/2015

**EXHIBIT G**

**UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS OF**

**FITSPOT VENTURES, LLC**
**A Delaware Limited Liability Company**

**August 5, 2015**

The undersigned, being the members of the Board of Directors (the "Board") of Fitspot Ventures, LLC, a Delaware limited liability company (the "Company"), acting pursuant to the authority vested in them by the Delaware General Corporation Law, hereby adopts the following resolutions, effective on the date set forth above.

**TERMINATION OF BUSINESS RELATIONSHIP WITH SOLOMON BIER**

**WHEREAS**, the Board deems it to be desirable and in the best interests of the Company to remove Solomon Bier ("Mr. Bier") from his position as co-founder of the Company and terminate his business relationship with the Company in all respects pursuant to and in accordance with the terms of (i) the Limited Liability Operating Agreement of the Company dated as of February 5, 2015 (the "Operating Agreement"), (ii) that certain Founder's Restricted Unit Agreement, dated as of January 15, 2015 between Mr. Bier and the Company (the "Founder Agreement") and (iii) that certain Confidentiality and Intellectual Property Assignment Agreement dated as of January 20, 2015 (the "Confidentiality Agreement");

**NOW THEREFORE BE IT RESOLVED**, that, effective immediately, Mr. Bier's Business Relationship with the Company (as such term is defined in the Founder Agreement) is hereby terminated;

**RESOLVED FURTHER**, that the termination of Mr. Bier's Business Relationship with the Company shall constitute a Termination Event as set forth in the Founder Agreement.

**RESOLVED FURTHER**, that the officers of the Company are hereby authorized, empowered and directed to take whatever steps may be necessary or desirable to carry out the above resolution, including amending the Operating Agreement of the Company and schedules thereto to reflect the termination of Mr. Bier's Business Relationship with the Company.

**RATIFICATION OF REMOVAL OF MR. BIER AS A CLASS B DESIGNEE**

**WHEREAS**, the Board has been presented with a Written Consent of the Class B Members of the Company dated of even date herewith (the "Written Consent of the Members"),

08/18/2015



whereby the member representing a majority of the outstanding Class B Units of the Company has voted to remove Mr. Bier from the Board of Directors of the Company pursuant to and in accordance with the terms of the Operating Agreement of the Company;

**NOW THEREFORE BE IT RESOLVED**, that, the Board hereby approves and ratifies the actions taken by the Class B members in the Written Consent of Members and that the officers of the Company are hereby authorized, empowered and directed to take whatever steps may be necessary or desirable to carry out the above resolution, including amending the Operating Agreement of the Company and schedules thereto to reflect the removal of Mr. Bier from the Board of Directors of the Company;

**GENERAL AUTHORIZING RESOULTIONS**

**RESOLVED**, that all acts and things heretofore done by any such officer, or by any other employee or agent of this Company, on or prior to the date hereof, in connection with the foregoing resolutions be, and the same hereby are, in all respects ratified, confirmed and approved as the acts and deeds of this Company.

[*Signature Page Follows*]

0 8 / 1 8 / 2 0 1 5



**IN WITNESS WHEREOF,** the undersigned has executed this Unanimous Written Consent of the Board on the date first written above.

**DIRECTORS**

Jonathan Cohn

Tarun Juneja

08/18/2015

**EXHIBIT A**

**FORM OF CLASS C GRANT LETTER**

08/18/2015