1  LEE TRAN & LIANG LLP
2    K. Luan Tran (SBN 193808)
     luan.tran@ltlattorneys.com
3    Joe H. Tuffaha (SBN 253723)
     joe.tuffaha@ltlattorneys.com
4    Julie A. Choi (SBN 281100)
     julie.choi@ltlattorneys.com
5  601 South Figueroa Street, Suite 3900
   Los Angeles, California 90017
6  (213) 612-8900 (telephone)
   (213) 612-3773 (facsimile)
7
   Attorneys for Defendant
8  Solomon Bier

9
10              **UNITED STATES DISTRICT COURT**

11             **CENTRAL DISTRICT OF CALIFORNIA**

12
13  FITSPOT VENTURES, LLC, a Delaware       Case No. 2:15-cv-06454-ODW(RAOx)
    limited liability company,
                                            Hon. Otis D. Wright II, Courtroom 11
14                        Plaintiff,
                                            **DEFENDANT SOLOMON**
15        v.                                **BIER'S OPPOSITION TO**
                                            **PLAINTIFF'S EX PARTE**
16                                          **APPLICATION FOR: (1)**
    SOLOMON BIER, an individual; and        **TEMPORARY RESTRAINING**
17  DOES 1-25, inclusive,                   **ORDER; AND (2) ORDER TO**
                          Defendants.       **SHOW CAUSE RE**
18                                          **PRELIMINARY INJUNCTION**

19                                          [*Filed concurrently with Declaration*
                                            *of Solomon Bier and Declaration of*
20                                          *K. Luan Tran*]

21
22
23
24
25
26
27
28

─────────────────────────────────────
DEF.'S OPPOSITION TO EX PARTE APPLICATION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Neither the facts of this case nor the law can support the "extraordinary relief" sought on *ex parte* basis in Plaintiff Fitspot Ventures, LLC's ("Fitspot" or "Plaintiff") *Ex Parte* Application ("Application").  This is particularly true given settled case law imposing a "very high burden" of proof on moving parties.  The Application should be denied for at least four independent reasons.

First, the "sky-is-falling" urgency asserted by Plaintiff in its papers is entirely fabricated.  Plaintiff has not shown that it is actually losing revenue, nor has it demonstrated a single loss of any sale or any customer or trainer.  To the contrary, Fitspot's revenues have continued to rise since the date of Defendant's illegal ouster and Fitspot has continued to book new customer training sessions, as recently as today.  The business is not in "virtual paralysis."  More importantly, there is no showing that any of the purported issues raised in the Application was *caused by* Defendant.  All Plaintiff has to offer are vague and conclusory assertions, as well as a few complaints of technical glitches by users.  Not only are these common occurrences for any mobile application (particular new ones such as Fitspot), there is no crucial showing that these glitches are, again, caused by Defendant.  As to Plaintiff's purported fear that Defendant would tamper with the code in the Heroku and Github accounts, Plaintiff fails to disclose that these accounts have been *frozen* due to the pending litigation.  Even if Defendant wanted to, he could not do anything with these accounts or the information therein.

Second, this case involves a *bona fide* dispute regarding the very ownership of Fitspot, as well as the underlying code.  Plaintiff improperly requests that the Court rule on the merits of the case pending before it, via an *ex parte* application.  Such a request is improper because it seeks to compel actions that form the basis of the

litigation.  To be clear, Defendant is the rightful co-owner of Fitspot.[1]  As conceded by Plaintiff, Defendant was Fitspot's "Technical Co-Founder." Defendant was the business' only technical person.  He created the Fitspot app. Without him, there is no Fitspot.  For almost eight months, Defendant worked day and night (with no pay like most startup founders) and transformed Fitspot from just an idea into a functioning company with a functioning mobile app.   Notably, the majority of the underlying algorithm was actually developed by Defendant prior to his involvement in Fitspot.

As will be shown via discovery, Fitspot's purported CEO Jonathan Cohn ("Cohn") has engaged in a fraudulent scheme, from the get-go, to take advantage of Defendant's technical expertise for free without having any intention to provide Defendant with any equity in Fitspot.  Just a few days after Defendant delivered the last major updates for the Fitspot app, Cohn ousted Defendant from the business, and claimed that Defendant had no ownership interest therein.  Discovery will show that this was part of Cohn's plan all along, and as a result, all contracts that Cohn induced Defendant to sign, including those on which the Application is bases, are void due to Cohn's fraud.  Discovery will also reveal that Cohn has exhibited a pattern of fraud throughout the existence of Fitspot and, on at least one occasion, even sought to defraud investors by inflating the valuation of Fitspot, notwithstanding Defendant's adamant protestations.  We have attached Cohn's incriminating statements here.  The purported "termination" of Defendant, after Defendant had completed the final product for the business, falls into a pattern of fraud by Cohn and has no legal effect and cannot strip Defendant of his equitable 50% share of Fitspot.

---

[1] Defendant will shortly amend his Answer to assert counterclaims for, *inter alia,* (1) Intentional Misrepresentation; (2) Fraudulent Inducement; (3) Concealment; (4) Rescission; (5) Breach of Implied Partnership Agreement; (6) Unjust Enrichment; (7) Violation of Business and Professions Code section 17200; and (8) Copyright Infringement.

Third, some of the issues raised in the Application were caused by *actions that were taken by Cohn not Defendant*. Cohn falsely asserts in his sworn declaration that Defendant "accessed the Company's Heroku account and intentionally disabled communication between Plaintiff's Heroku and Slack accounts." To the contrary, after Defendant was "terminated" by Cohn, he notified Cohn that he would be seeking legal counsel. Cohn then immediately deleted Defendant's company and email accounts, removed Defendant from his <u>personal</u> Apple account (revoking the developer account Defendant paid for) and signed Defendant out of all third-party libraries (unrelated to Fitspot) including Localystics and Fabrics. In taking the above steps, *Cohn inadvertently deleted* important features, including Push notifications as well as Slack web-hooks that were tied to Defendant's email account. Cohn now seeks to blame Defendant for his own errors which apparently caused him to be unable to access the Slack functionality.

Fourth, the relief Plaintiff seeks via this Application is overbroad. Plaintiff's proposed temporary restraining order ("TRO") would essentially force Defendant to *immediately* hand over all of the intellectual property that he asserts he is the owner of. Plaintiff is attempting to circumvent due process and a trial on the merits in order to gain access to Defendant's intellectual property ("IP"). If Plaintiff were to succeed, it would then copy this IP and make it exponentially more difficult for Defendant to assert his rights through this litigation.

In sum, once we overlook the rhetoric in Plaintiff's papers and focus on the actual proffered "evidence," we will see that the evidence is sorely lacking. Plaintiff falls far short of satisfying its very high evidentiary burden. This Court should deny Plaintiff's Application.[1]

_____

[1] Defendant believes that the matter raised in the Application should end with the denial thereof. If this Court were to require a preliminary injunction hearing, it should order expedited and limited discovery so that Defendant could inquire, *inter alia*, about Plaintiff's purported irreparable injury and other claims since Defendant currently has no visibility inside of Defendant's operations.

## II.   ARGUMENT

The party applying for a temporary restraining order on *ex parte* basis faces a "very high burden" of proof.  This Court recently reminded us of this standard in *Bonded Apparel, Inc. v. R2D Apparel, Inc*., 2015 WL 3824168, at *1 (C.D. Cal. June 19, 2015, Wright, II J.) as follows:

> "A court may only issue an ex parte temporary restraining order only if '*specific facts* in an affidavit or a verified complaint clearly show that *immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition*' and 'the movant's attorney certifies in writing any efforts to give notice and the reasons why it should not be required." *Fed.R.Civ.P*. 65(b)(1); see also C.D. Cal. L.R. 7–19.2.  Although the requirements in Rule 65(b) are stringent, they 'reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 438–39, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).  'The standard for issuing a temporary restraining order without notice to the adverse party is *very stringent*, and the burden on the movant to show why notice is not required is accordingly *very high*.' *Shallman v. Ocwen Loan Servicing*, LLC, No. 14–cv–0863, 2014 WL 2533836, at *2 (C.D.Cal. June 5, 2014).  'The Ninth Circuit has cautioned that there are very few circumstances justifying the issuance of an ex parte TRO.' *Caldwell v. Wells Fargo Bank, N.A*., No. 13–cv–1344, 2013 WL 3789808, at *3 (N.D.Cal. July 16, 2013) (*citing Reno Air Racing Assoc., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir.2006)) (emphasis added).

This Court's procedures also make clear that "Ex parte applications are solely for extraordinary relief and should be used with discretion.  Sanctions may

be imposed for misuse of ex parte applications. *See Mission Power Eng'g v. Cont'l Casualty Co.*, 883 F. Supp. 488 (C.D. Cal. 1995)." Indeed, *ex parte* applications "are inherently unfair" because "the moving party's papers reflect days [or more] of investigation and preparation," while "the opposing party has perhaps a day or two." *Mission Power*, 883 F. Supp. at 490. A moving party "must show why [it] should be allowed to go to the head of the line in front of all other litigants and receive special treatment." *Id*. at 492. The interruption caused by an ex parte request is significant:

> When an ex parte motion is filed, it is hand-delivered immediately from the clerk's office to the judge. The judge drops everything except other urgent matters to study the papers. It is assumed that the tomatoes are about to spoil or the yacht is about to leave the jurisdiction and that all will be lost unless immediate action is taken. Other litigants are relegated to a secondary priority. The judge stops processing other motions. Even hearings or trials—where a courtroom full of deserving users of the court are waiting—are often interrupted or delayed. It is rare that a lawyer's credibility is more on the line, more vulnerable, than when he or she has created this kind of interruption. Lawyers must understand that filing an ex parte motion, whether of the pure or hybrid type, is the forensic equivalent of standing in a crowded theater and shouting, 'Fire!' There had better be a fire." *Id*. at 491-492.

There is nothing "extraordinary" about this situation justifying *ex parte* relief. Here, the tomatoes are not about to spoil, the yacht is not about to leave the jurisdiction, and there is no fire. As shown below, Plaintiff has failed to sustain its "very high" burden of proof, via "specific facts" in order to obtain the extraordinary—and dispositive—relief it is seeking in its Application.

**A.     The Application Is Based On Vague and Conclusory Allegations, Including Outright False Representations**

Plaintiff makes the over-the-top claim that as a result of Defendant's action, it "is now in virtual paralysis."  As "evidence" of this claim, Plaintiff offers the following identical statements from the declarations of Jonathan Cohn and Sammy Courtright:

> "[due to Defendant's conduct] the Company was entirely deprived of its ability to manage its business: unable to determine if and when users were booking training sessions, unable to pay trainers, unable to repair glitches in the code, unable to modify any component of the App, unable to access its customer information and completely deprived of its ability to access to its own data, trade secrets and intellectual property." *See* Cohn Dec., ¶13; Courtright Dec., ¶3.

These statements, without more, are too vague and conclusory to support the granting of a TRO. *See Givemepower Corp. v. Pace Compumetrics, Inc.*, 2007 WL 951350, at *7 (S.D. Cal. Mar. 23, 2007) (finding insufficient evidence of irreparable harm where plaintiff's assertion regarding loss of business goodwill "is too vague and conclusory to be afforded significant weight.").  *See also Davis v. Ramen*, 2010 WL 1791253 at *1 (E.D. Cal. May 4, 2010) ("Plaintiff's conclusory allegations, unsupported by any evidence, are not sufficient to justify the extraordinary and drastic remedy of a preliminary injunction").

Indeed, there is no specific evidence of the "who, what, where, when, why" supporting these statements.  There is also no showing of whether Plaintiff actually attempted to: (i) pay its trainers; (ii) repair the purported glitches in the code; (iii) modify the App component; or (iv) access its customer information.  There is equally no evidence that even if Plaintiff attempted to do the above, its attempt was thwarted *because of* Defendant's alleged misconduct.  Further, Plaintiff's

1  complaint that it was "completely deprived of its ability to access its own data,

2  trade secrets and intellectual property" is simply too vague and conclusory.  What

3  "data, trade secrets, and intellectual property" are we talking about?  These are not

4  the "specific facts" required by *Fed.R.Civ.P.* Rule 65(b)(1).

5          Moreover, the declarants make no showing that they have any technical

6  expertise to assess that the issues raised in the statements above were *caused by*

7  Plaintiff's conduct.  Based on information on Plaintiff's website, Mr. Cohn "is an

8  entrepreneur and nationally certified personal trainer [with] a BA in economics and

9  history from Emory University, Atlanta."  Likewise, Ms. Courtright is described as

10  having "a BA in fine arts from the University of Miami, she's a dancer, an actor, a

11  singer and a nationally certified Pilates instructor…"  Tran Decl., Exh. A.

12          More importantly, the above statements by Mr. Cohn and Ms. Courtright are

13  outright false.  As to the claim that the trainers have not been paid, Plaintiff's own

14  exhibit reflects a payment made to a trainer.  See Wood Decl., Exh. A.  As to the

15  claim that the users are unable to communicate with the trainers or that the

16  business could not collect payments, this claim is not true.  *See* Declaration of

17  Solomon Bier ("Bier Decl."), ¶8.  Fitspot's users and trainers are able to

18  communicate via Twillio, which is a SMS (Text Message) and voice service where

19  Fitspot and Cohn are able to call and text their user base as well as monitor all

20  communication between any Fitspot customer or trainer/employee.  *Id.*

21  Furthermore, Fitspot has continued to send automatic notifications to Defendant's

22  email account every time a training session is booked and/or paid for.  *Id.*

23  Defendant has no control over his receipt of these notifications as Fitspot sends

24  automated messages to his personal gmail account via contact@fitspotapp.com, an

25  auto email reply set up by Fitspot which he has no access to.  Any claim that the

26  business is currently in paralysis is equally untrue.  For example, based on these

27  notifications, between the time Fitspot submitted their application for a TRO

28  (yesterday) and today, Fitspot has communicated with, collected payment, and

DEF.'S OPPOSITION TO EX PARTE APPLICATION

1   trained thirteen clients via the app/system they claim is not functioning. *Id.*

2   Furthermore, Cohn and Courtright have personally trained users, collected

3   revenue, and been paid out, all while claiming that Fitspot is not functioning. *Id.*

4        Plaintiff's claim that Defendant "completely controls the access credentials

5   to the data repositories where Plaintiff's proprietary information is stored [Github

6   and Heroku accounts]" is also incorrect.  Plaintiff should have disclosed that due to

7   this litigation, Defendant's Github and Heroku accounts have been *frozen*—and

8   making it impossible for Defendant to make any changes or do anything with these

9   accounts. *See* Bier Decl., ¶6.

10        At best for Plaintiff, it could only come up with evidence of about five

11   instances in which there were purported glitches with its Fitspot app. *See*

12   Courtright Dec., ¶4, Exh. A-C.  But again, there was no evidence that these

13   glitches were caused by any nefarious actions by Defendant.  As Defendant shows,

14   these glitches are normal with all mobile applications (especially new ones such as

15   Fitspot).  Bier Decl., ¶10.  In fact, there were similar glitches with Fitspot before

16   Plaintiff was illegally ousted from the business. *Id.*

17        At the end of the day, Plaintiff's claim that its business is "in a virtual

18   paralysis" is exaggerated and frankly, not true.  Conspicuously absent from

19   Plaintiff's papers is any evidence that it has lost clients or revenue since

20   Defendant's ouster.  In fact, the undisputed evidence shows that between the ouster

21   and the August 14 hearing in the state court, Plaintiff's daily revenue has increased

22   by approximately 80%.  Bier Decl., ¶7.  With further limited discovery, Defendant

23   expects to see similar or even better increase in Plaintiff's revenue between August

24   14 and today.  Plaintiff has completely failed to sustain its very high burden of

25   proof.  The Application should be denied on this ground alone.[2]

26

27   [2] Mr. Cohn also falsely asserts in his sworn declaration that Defendant "accessed
the Company's Heroku account and intentionally disabled communication between

28   Plaintiff's Heroku and Slack accounts." After Plaintiff was ousted, he notified Mr.
Cohn that he would be seeking legal counsel.  Bier Decl., ¶5.  Mr. Cohn then

**B.**   **The Application Should Also Be Denied Because It Essentially Seeks A Determination On the Merits Of This Lawsuit**

It is settled that "where the granting of a preliminary injunction would give to a plaintiff all the actual advantage which he could obtain as a result of a final adjudication of the controversy in his favor, a motion for a preliminary injunction ordinarily should be denied." *Kass v. Arden-Mayfair, Inc*., 431 F. Supp. 1037, 1041 (C.D. Cal. 1977).   The issue of who owns Fitspot, including its intellectual property, is at the center of this lawsuit.   In the Complaint, Plaintiff claims that Defendant has misappropriated or converted its IP.   In the days ahead, Defendant will also file counterclaims to assert his ownership interest in Fitspot and the IP because he is the co-owner and co-founder of the business.   Because Plaintiff is requesting that this Court, via this Application, order Defendant to immediately return code (that belongs to Defendant) to Plaintiff, this request implicitly requires this Court to make a determination as to whether Defendant is the rightful co-owner of this IP.   As the *Kass* court has held, this Court should refrain from making such an order that may provide Plaintiff with the "actual advantage" on the final adjudication of this case, especially on an *ex parte* basis.

**C.**   **The Application Seeks Relief That Is Overbroad**

"An overbroad injunction is an abuse of discretion."   *E. & J. Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280, 1297 (9th Cir. 1992).   Here, Plaintiff is trying

---

immediately deleted Defendant's company and email accounts, removed Defendant from his <u>personal</u> Apple account (revoking the developer account Defendant paid for) and signed Defendant out of all third-party libraries (unrelated to Fitspot) including Localystics and Fabrics.   *Id*.   In taking the above steps, *Mr. Cohn inadvertently deleted* important features, including Push notifications as well as Slack web-hooks that were tied to Bier's email account.   *Id*.   Plaintiff now seeks to blame Defendant for Mr. Cohn's own errors.

1   to obtain a TRO that is much broader in scope than what the state court had

2   ordered.  While the state court only "enjoined" Defendant from certain conduct

3   (*prohibitive* injunction), Plaintiff, in its proposed order filed with this Application,

4   is trying to sneak in additional *mandatory* injunctions requiring Defendant to

5   immediately deliver to Plaintiff's counsel the very same assets at issue in this co-

6   founder lawsuit.  *See* Proposed Order at 5-6.  This Court should not indulge

7   Plaintiff's attempt to overreach. [3]

8

9                        **III.    CONCLUSION**

10

11      Plaintiff is shouting "fire" where there is no "fire."  Fitspot is fully functional

12   and there is no evidence that any of the alleged issues raised in Plaintiff's

13   Application was caused by Defendant.  Because Plaintiff cannot sustain its high

14   burden of proof, its Application for a TRO should be denied.[4]

15

16   [3] Plaintiff's claim that Defendant has violated the State Court's TRO by refusing to
     return a hard drive (which does not belong to Plaintiff) is meritless. The State
17   Court in its TRO never issued any mandatory injunction requiring Plaintiff to
18   perform any positive action such as returning the hard drive.  In fact, the TRO—
     drafted by Plaintiff—makes clear that the very issue of whether Defendant is
19   required to return the hard drive would be litigated at the September 3, 2015
     preliminary injunction motion hearing.  *See* TRO at 3-4 (requiring Defendant to
20   show cause on September 3 why he should not return the hard drive to Plaintiff).
21
22   [4] If the Court grants any relief, Plaintiff should be required to post a bond sufficient
     to reimburse Defendant for any injury suffered during any period of time that the
23   TRO may be in effect.  *See* Fed. R. Civ. P. 65(c) (permitting a court to grant
24   preliminary injunctive relief "only if movant gives security in an amount that the
     court considers proper to pay the costs and damages sustained by any party found
25   to have been wrongfully enjoined or restrained").  "When setting the amount of
     security, district courts should err on the high side." *Mead Johnson & Co. v.*
26   *Abbott Labs,* 201 F.3d 883, 888 (7th Cir. 2000).  The appropriate amount of such a
27   bond would depend on the nature and scope of any relief granted, and if any relief
     granted, Defendant asks the Court to set a schedule for the submission of short
28   supplemental briefs on this issue.

DATED: August 27, 2015        LEE TRAN & LIANG LLP

By:     /s K. Luan Tran
            K. Luan Tran
            Joe H. Tuffaha
            Julie A. Choi
            Attorneys for Defendant
            Solomon Bier

DEF.'S OPPOSITION TO EX PARTE APPLICATION